DR. SIDNEY GREENSPAN OR SYLVESTER S. GARFIELD, IN THE ALTERNATIVE, PLAINTIFFS-APPELLANTS, v. THOMAS SLATE AND NELDA SLATE, HIS WIFE, DEFENDANTS-RESPONDENTS.

Argued May 11, 1953—Decided June 1, 1953.

428

*Mr. Sylvester S. Garfield* argued the cause *pro se* and for appellant Dr. Sidney Greenspan.

The opinion of the court was delivered by
VANDERBILT, C. J.

## I. THE FACTS AND THE ISSUE

Barbara Slate, the 17-year-old daughter of the defendants, injured a foot while playing basketball at high school. Within two or three days it became exceedingly swollen and conspicuously discolored so that she could walk on it only with the greatest difficulty and pain. Her parents, thinking it nothing more than a sprain, declined to provide her with medical aid. The plaintiff, Garfield, a member of the bar of this State, discovered her plight by chance, when she was on a visit to his home in company with Berkley Badgett, his housekeeper's son, who was courting her.

Mr. Garfield promptly sent young Badgett, his mother and Barbara to the nearby office of the plaintiff, Dr. Sidney Greenspan, who discovered from X-ray plates he made that a bone of Barbara's foot had been fractured. He applied a cast which Barbara wore for about a month until it was removed by Dr. Greenspan. Meantime she used crutches. Barbara lived at home with her parents and the presence of the cast and her use of crutches were thus known to them. Clearly the broken bone that was causing much swelling, high discoloration and great pain necessitating the taking of X-ray plates, the application of a cast for a month and the use of crutches did present an emergency. The testimony of Dr. Greenspan that permanent injury would have ensued if there had not been proper medical care and attention at the time is uncontradicted.

On the completion of his services Dr. Greenspan rendered a bill to the parents of $45, which they have refused to pay. Mr. Garfield thereupon brought suit against them on behalf of Dr. Greenspan or himself in the alternative. At the end of the plaintiffs' case the trial court granted the defendants' motion to dismiss on the ground that Dr. Greenspan had acted without any express authorization from the defendants and that the proofs were insufficient in the circumstances to establish an implied authorization by them. On appeal the Appellate Division of the Superior Court, considering itself bound by earlier decisions in our courts, reluctantly affirmed the judgment below. Because of the public importance of the question presented, we granted certification. 11 *N. J.* 410 (1953).

The question before us is whether or not the parents of an infant child are liable, in the absence of a contract, express or implied in fact, for necessaries furnished their child in an emergency.

## II. THE CONFLICTING VIEWS AT LAW AND IN EQUITY

According to Blackstone, "the duty of parents to provide for the maintenance of their children is a principle of natural law," 1 *Bl. Comm.* 447. Blackstone waxes eloquent over this principle of "natural law" and quite properly so when the relations of parent and child are normal, but unconvincingly in the only cases with which the law should be concerned, *i. e.*, when the parent fails to perform his natural duty. His reasoning is unconvincing, because in Blackstone's time the parent's duty at the common law was drastically restricted with respect to the method of enforcing it:

"No person is bound to provide a maintenance for his issue, unless where the children are impotent and unable to work, either through infancy, disease, or accident, and then is only obliged to provide them with necessaries, the penalty on refusal being no more than 20s a month." Ibid. 449.

Neither the child nor any third party who ventured to supply the child with his necessaries had any cause of action

against the parents to enforce the duty of support which Blackstone termed "a principle of natural law." The utter inadequacy of the common law in this stage of its development is especially manifest in meeting emergencies involving the life or limb of a child.

A parent might, it is true, make his child his agent, express or implied in fact, to make contracts for the child's necessaries:

"If a father does any specific act from which it may reasonably be inferred that he is authorizing his son to contract a debt, he may be liable with respect to the debt so contracted; but the mere moral obligation on the father to maintain his child affords no inference of a legal promise to pay his debts." *Mortimore v. Wright,* 6 *M. & W.* 482 (*Exch. Div.* 1840).

"If a father turns his son upon the world, his son's only resource, in the absence of anything to show a contract on the father's part, is to apply to the parish, and then proper steps will be taken to enforce the performance of the parents' legal duty." *Shelton v. Springett,* 11 *C. B.* 452 (*Com. Pl.* 1851).

provided, of course, the child survives in the meantime! A child's need in these circumstances is quite as great as that of a neglected wife, but his rights and remedies are far less effective than hers, for she has an absolute right to pledge her husband's credit for necessaries, even though there is no agency in fact existing such as the common law required in the case of a child to permit recovery. The law imposes the obligation on her husband for the benefit of the deserted wife without regard to whether or not there was any agency in fact, *Strawbridge & Clothier v. Sigle,* 73 *N. J. L.* 419 (*Sup. Ct.* 1906). The *quasi*-contractual nature of the husband's duty to a neglected wife is demonstrated by the fact that at common law it survives her death so as to include her funeral expenses, *Mondock v. Gennrich,* 19 *N. J. Misc.* 499 (*Dist. Ct.* 1941).

The impact of these shortcomings of the common law remedy with respect to the maintenance of a child in comparison with that available to a neglected wife inevitably led the law courts to hold, in an effort to achieve a measure of justice, that "the authority of an infant to bind the father

for necessaries may be inferred from *slight* evidence (italics supplied)." *Freeman v. Robinson,* 38 *N. J. L.* 383, 384 (*Sup. Ct.* 1876). Thus in *Fluck v. Tollemache,* 171 *E. R.* 1078 (*C. P.* 1823) it was said:

"An action can only be maintained against a person for clothes supplied to his son, either when he has ordered such clothes, and contracted to pay for them; or when they have been at first furnished without his knowledge, and he has adopted the contract afterwards: such adoption may be inferred from his seeing his son wear the clothes, and not returning them, or making at, or soon after the time, when he knows of their being supplied, some objection."

But any such artificial basis for a fundamental doctrine as "inferences from slight evidence" is not only unsound in principle but ineffective in operation, because it does not reach the cases where no express promise exists and where there is no "slight evidence" from which to infer a promise, and the cases not so reached are the ones where in simple justice a legal right and an adequate remedy are most needed. There is quite as great necessity for the imposition of a *quasi*-contractual obligation by operation of law in favor of a neglected child as there is in the case of a neglected wife.

The Court of Chancery within the limit of its jurisdiction was not content to regard the father's duty as a mere principle of natural law, but it has sought to enforce it as a matter of equity. Thus Chancellor Benjamin Williamson applied the prevailing American view as enunciated in *Van Valkinburgh v. Watson,* 13 *Johns.* (*N. Y.*) 480, 7 *Am. Dec.* 395 (*Sup. Ct.* 1816), that a parent is bound to provide his infant child with necessaries and that if he neglects to do so, a third person may supply them and charge the parent therefor, in reaching his conclusions in *Tomkins v. Tomkins,* 11 *N. J. Eq.* 512, 517–518 (*Ch.* 1858):

"The position taken by the complainant's counsel is, that a parent is under no legal obligation to support his child, and that whoever furnishes a child with necessaries, must do it gratuitously; that no recovery can be had for such necessaries, unless they were furnished under an express contract with the parents. What was

said by the judges in the cases of *Urmston v. Newcomer*, 4 *Ad. & Ellis* 899; 31 *E. C. L.; Mortimore v. Wright*, 6 *M. & W.* 48, would seem to sustain the position. Such is not the law in New Jersey. The law, as it has been adopted in this state, is as laid down by the court in *Van Valkinburgh v. Watson and Watson*, 13 *J. R.* 480. A parent is bound to provide his infant children with necessaries; and if he neglect to do so, a third person may supply them, and charge the parent with the amount. But such third person must take notice of what is necessary for the infant, according to his situation in life; and where the infant lives with his parent, and is provided for by him, a person furnishing necessaries cannot charge the parent. 'When the infant is *sub potestate parentis*, there must be a clear and palpable omission of duty, in that respect, on the part of the parent, in order to authorize any other person to act for, and charge the expense to the parent.'"

But in *Freeman v. Robinson*, 38 *N. J. L.* 383, 384 (1876) we have a characteristic instance of the perennial conflicts especially in earlier days of our courts of law and of equity. There the former Supreme Court, without citing the *Tomkins* case or *Van Valkinburgh v. Watson, supra,* or the weight of concurring authority in this country, held:

"The duty of a father to provide maintenance for his children is a mere moral obligation. Except in cases within the statute of Elizabeth, and by the procedure there pointed out, he is not legally compellable to perform this duty.

No action can be maintained against a father for goods purchased on his credit by his minor child, even though they be necessaries, unless the father has expressly or impliedly authorized the purchase on his credit. The authority of an infant to bind the father by contract for necessaries may be inferred from slight evidence. But, nevertheless, where the parent gives no authority, and enters into no contract, he is no more liable to pay a debt contracted by his child even for necessaries, than a mere stranger would be. 1 *Parsons on Contracts* 299; 1 *Chitty on Contracts* 210; *Mortimore v. Wright*, 6 *M. & W.* 482; *Raymond v. Loyl*, 10 *Barb.* 489; *Plotts v. Roseberry*, 4 *Dutcher* 146. The mere moral obligation of a parent to maintain his child affords no legal inference of a promise to pay a debt contracted by him even for necessaries. *Shelton v. Springett*, 11 *C. B.* 452."

Not only does this decision ignore American authorities, but the English cases cited by it were decided after the Revolution and accordingly are not part of our common law, *In re Vince*, 2 *N. J.* 443, 452 (1949). *Plotts v. Rosebury,*

28 *N. J. L.* 146 (*Sup. Ct.* 1859), moreover, was not in point, involving, as it did, a case where a contract implied in fact might be inferred from previous transactions between the parties with reference to purchases made by the defendant's infant son. The *Freeman* case, although giving lip service to the doctrine of inferences from "slight evidence" (*p.* 384), goes so far as to hold (*pp.* 385–387) that not even an express promise by the defendant to pay for the goods sold to his son, which certainly is more than "slight evidence"—indeed, it is the most explicit and unambiguous evidence imaginable—would be supported by the defendant's moral obligation to support his child, out of deference to technical rules of the law of consideration, in a situation that should not be governed by contract at all, but by the equitable principle of *quasi*-contracts.

■■ In contrast to these technicalities of the common law is *Alling v. Alling*, 52 *N. J. Eq.* 92 (*Ch.* 1893). There Vice-Chancellor Pitney held:

"The question of the extent of the duty of a parent to support and maintain an infant child can be raised in this court only when the child has a fortune of its own. This court has no jurisdiction to compel a parent to support an infant child. *In re Ryder*, 11 *Paige* 185; *Hodgens v. Hodgens*, 4 *Cl. & F.* 323. But when the infant child has an estate of its own and the question arises, directly or indirectly, how much, if anything, the parent shall be allowed out of such estate for the infant's support, the court will consider and determine the parent's duty toward the child and his or her ability to perform that duty. Such is the present case." (at *p.* 96)

The learned vice-chancellor then proceeded to review at length the English Chancery decisions and the American cases, both legal and equitable, holding that each parent is liable for the support of his infant children (*pp.* 97–108), and came to the inevitable conclusion that (*p.* 108):

"For these reasons I must decline to consider *Pyatt v. Pyatt*, [46 *N. J. Eq.* 285 (*E. & A.* 1889)] as binding authority for the position that a widowed mother is entitled, without regard to her own ability, to full compensation and indemnity from her child's estate for support and maintenance rendered to it during infancy. Such a rule seems to me not to be warranted by the ancient authori-

ties, influenced, as they were, by the general disability of the wife resulting from coverture; much less does it seem in step with the modern status of woman under the law and her general emancipation from the artificial restraints of her previous condition and her ability to enter upon many pursuits once closed to her. On the contrary, I think that, in determining how much the widowed mother is to be allowed, we must take into consideration, as in all cases, all the circumstances—the mother's capacity and ability and the child's fortune. For instance, it would be monstrous, I think, to hold that if a widowed mother was entitled in her own right to a fortune of $20,000, or had a fixed income of $2,000 a year, and had an only daughter, an infant, entitled to a fortune of $5,000, and should educate and support her daughter during infancy in a style commensurate with her own fortune, she should be entitled to call upon the child when she came of age for all the expense of her support and education, though it might far exceed the child's fortune. And I think the result would be much the same if the mother had a well-established earning ability to the same extent."

In equity, the parents' obligation to support and educate their children is much more than a principle of natural law; it is an obligation enforced wherever equity has jurisdiction on equitable principles in the light of the facts of the individual case. "The physical ability of the child to earn its bare food and clothing is not the test or gauge in this court of a parent's duty to support and educate it" (*p.* 96), nor does the fact that the child has an estate of its own excuse the parent from all obligation to it. In determining the question of support the court will take into consideration both the parents' ability to pay and the child's fortune.

*In re Ganey,* 93 *N. J. Eq.* 389 (*Ch.* 1922), affirmed without opinion, 94 *N. J. Eq.* 502 (*E. & A.* 1923), was a suit by the sister and brother-in-law of a lunatic for reimbursement out of the lunatic's estate for the maintenance of her daughter after the death of her husband. Relying expressly on the statement in *Alling v. Alling,* 52 *N. J. Eq.* 92, 96, *supra,* that "This court has no jurisdiction to compel a parent to support an infant child," and on the holding in *Freeman v. Robinson,* 38 *N. J. L.* 383, *supra,* that "The obligation of a father to maintain his child affords no legal inference of a promise to pay for necessaries," the trial court denied the

claim. The reference to *Freeman v. Robinson*, however, is mere dictum, the Court of Chancery being without jurisdiction on the facts of the case under *Alling v. Alling, supra*. But the court was in error in supposing that equity lacked jurisdiction in all cases involving claims for the support of a child. As we have seen from our discussion of the *Alling* case, "The question of the extent of the duty of a parent to support and maintain an infant child can be raised in this court only when the child has a fortune of its own." 52 *N. J. Eq.* 92, 96. All Vice-Chancellor Pitney implied by the statement relied on in *In re Ganey* that equity had no jurisdiction to compel a parent to support an infant child, as his entire discussion and conclusion clearly reveals, is a lack of jurisdiction to enforce a claim for money damages without the existence of some special equity.

Nor does the opinion in *In re Ganey* mention *Tomkins v. Tomkins*, 11 *N. J. Eq.* 512, *supra*, the first expression of our courts on the issue under consideration. But *Tomkins v. Tomkins* has not yet spent its force, for in *Murphy v. Murphy*, 102 *N. J. Eq.* 552, 554 (*E. & A.* 1928), Judge White, speaking for a unanimous court, said:

"It may well be, although we do not so decide, that a husband may be liable, in a common law suit, to unpaid creditors who have supplied necessaries for the support of his minor children whose custody has been awarded to their mother under any alimony order for their support, which, under unexpected extraordinary circumstances, has proved insufficient (*Tomkins v. Tomkins*, 11 *N. J. Eq.* 512); * * *."

It is doubtful, moreover, if *In re Ganey* would have been decided as it was, if it had come up for consideration two years later, after the passage of *R. S.* 9:1–1 (*L.* 1926, *c.* 201, *sec.* 1, *p.* 333):

"The father and mother of a minor child are equally entitled to its services and earnings. If one of the parents be dead, has abandoned the child, or has been deprived of its custody by court decree, the other is entitled to such services and earnings.

The parents jointly may maintain an action for the loss of the wages or services of their minor child when such loss is occasioned

by an injury, wrongfully or negligently inflicted upon such child. If one of the parents be dead, has abandoned the child, has been deprived of its custody by court decree or refuses to sue, the other may sue alone."

It is unthinkable that the Legislature would have granted such rights to the parents of a minor child without the implication of the correlative duties of support and education by its parents.

The question before us has been considered or touched on in a number of other cases, all of which relate back to the doctrine of the *Freeman* case, without, however, impugning the holdings in the *Tomkins* or *Alling* cases, but it will serve no useful purpose to discuss or enumerate all of them; see, *e. g.*, *In re Rogers*, 96 *N. J. Eq.* 6, 7 (*Ch.* 1924), *Meier v. Planer*, 107 *N. J. Eq.* 398 (*Ch.* 1930) and *Cohen v. Cohen*, 6 *N. J. Super.* 26 (*App. Div.* 1949). Suffice it to say that it appears that the question to be resolved here has not yet been passed on in the court of last resort, but that there are divergent views at law and in equity as to the fundamental nature of a parent's obligation to maintain an infant child awaiting decision.

The common law rule with reference to the support of minor children can only be understood in the light of the pertinent statutes. *R. S.* 44:4–104 is the modern counterpart of the statute referred to in 1 *Bl. Comm.* 449, *supra*; it provides that where a father or mother deserts a child, the director of public welfare of the county welfare board may apply to the juvenile and domestic relations court for an order for "suitable support and maintenance" to be provided by the husband or wife. The court may compel the defendant to give reasonable security and by *R. S.* 44:4–105 may sequester the property of the defendant, appoint a receiver and apply the personal property and the rents and profits of the real estate toward such support and maintenance. By *R. S.* 30:4–60 and 66 similar provisions are made for insane children and by *R. S.* 30:4–176 for the indigent feebleminded. As part of a matrimonial cause, an aggrieved wife may by *N. J. S.* 2A:34–24 obtain suitable support for her-

self and her children, but if the neglected child is taken care of by others than a parent no duty of compensation is created by the common law nor is there at common law any forfeiture of the parent's rights in the child.

To these civil obligations are added penalties and criminal sanctions. By *R. S.* 44:4–108 and *R. S.* 44:1–147 a father or mother who deserts a child or fails or neglects to provide for it may be adjudged a disorderly person, subject to a commitment for not exceeding 60 days. By *N. J. S.* 2A:100 (section 1 of the Uniform Desertion and Nonsupport Act, 10 *U. L. A.* 1, 6), such misconduct is made a misdemeanor:

"Any husband or father who deserts and willfully neglects or refuses to provide for and maintain his wife and minor child or children, is guilty of a misdemeanor, and shall be punished by a fine of not more than $100, or by imprisonment for not more than 1 year." *N. J. S.* 2A:100–1.

"Any husband who deserts or willfully neglects or refuses to provide for the support and maintenance of his wife, in destitute or necessitous circumstances, or a parent who deserts or willfully neglects or refuses to provide for the support and maintenance of his or her minor child or children, in destitute or necessitous circumstances, is guilty of a misdemeanor. If a fine be imposed, the court may direct the same to be paid in whole or in part to the wife, or to the guardian, custodian or trustee of said minor child or children." *N. J. S.* 2A:100–2.

It is interesting to note in passing that the phrase "without lawful excuse" in the Uniform Act was omitted in adopting it here. This statute, insofar as minor children are concerned, is merely declaratory, for it was common law misdemeanor to neglect to provide for children where they suffer injury therefrom, *R. v. Friend Russ. & Ry.* 20, 168 *E. R.* 662 (1802); *R. v. Hogan, 2 Den.* 277, 169 *E. R.* 504 (1851); *R. v. Phillpot Dears* 179, 169 *E. R.* 686 (1853); 9 *Halsbury's Laws of England* (2d ed.) 443.

The civil statutes seek to enforce not an obligation of a parent to the minor child, but a duty to the public if it becomes a public charge. The penal and criminal statutes, on the other hand, aim at coercing a defaulting

parent into performing an obligation to a minor child for which the common law rule provides no civil remedy. Such a situation is distinctly anomolous and reflects the shortcomings of the common law in denying a civil recovery to the minor child or those who come to his aid. To quote *Morris, The Role of Criminal Statutes in Negligence Actions,* 49 *Col. L. Rev.* 21, 22 (1949):

"Once the legislature has seen fit to punish conduct that falls within the immunity of a no-duty rule, there is all the more reason for reconsidering the civil law."

## III. THE PREFERABLE RULE

As we have seen, there are no precedents in our courts of last resort so we are free to choose between the common law rule and the Chancery principle in deciding the instant case. Normal instincts of humanity and plain common honesty as well as the substantial weight of judicial decisions in this country, the uniform rule of the civil law in European countries, and the unanimous views of the text writers and the *Restatement of the Law* all combine to demonstrate the superiority of the equitable rule. Whatever objections. may be raised thereto have been based either on fancied fears as to its effect in operation, which long experience with it in many jurisdictions have shown to be altogether groundless, or on procedural misconceptions which should long since have been discarded.

It shocks one's sensibilities to think that the common law would permit a wealthy parent to do no more than respond to the minimum demands of the Poor Law, while he himself is living in affluence. It reflects a point of view which is utterly inconsistent with the common feelings of humanity, and which fortunately is found in relatively few instances of unnatural conduct, yet it is against those instances that the law must safeguard the offspring of an abnormal human being. The reasons for the prevailing American rule were well expressed in the early case of *Finch v. Finch,* 22 *Conn.* 411 (*Sup. Ct. Err.* 1853):

"The case discloses nothing from which we can infer or presume that the mother is not of equal pecuniary ability with the father to maintain their common offspring, nor whether the father has adequate ability to do it. There is a law of our universal humanity as extensive as our race, which impels parents, whether fathers or mothers, to protect and support their helpless children. It is a duty common to both, and the consequent obligation is common. Blackstone very properly says that 'the duty of parents to provide for the maintenance of their children is a principle of *natural law.* By begetting them, therefore, they have entered into a voluntary obligation to endeavor, as far as in them lies, that the life which they have bestowed shall be supported and preserved. And thus the children will have a perfect right of receiving maintenance from their parents.' This duty and this obligation have been variously modified by the positive laws of civilized countries, but fully recognized by all. Connected with this obligation of maintenance there is a parental privilege. The parent is entitled to the custody and care of the child which he sustains and to such service as it can render, and he has a right to exercise his own discretion in determining the fitness and necessity of the allowances to be made and of the support to be furnished to his children, for which he is to be made chargeable. * * * The legal liability of the parent necessarily depends upon his or her ability to furnish the maintenance."

The substantial weight of authority supports this equitable, humanitarian view, 4 *Vernier, American Family Laws* 56 (1936), 46 *C. J.* 1256, 1262, 1264, 67 *C. J. S., Parent and Child,* §§ 14, 15, 16, *pages* 686, 688, 697, 39 *Am. Jur.* 630, 672, 686. See also 7 *A. L. R.* 1070, 10 *A. L. R.* 1138. The principles governing the application of the rule are set forth in three sections of the *Restatement of the Law of Restitution* (1937) :

"§ 112. A person who without mistake, coercion or request has unconditionally conferred a benefit upon another is not entitled to restitution, except where the benefit was conferred under circumstances making such action necessary for the protection of the interests of the other or of third persons.

"§ 113. A person who has performed the noncontractual duty of another by supplying a third person with necessaries which in violation of such duty the other had failed to supply, although acting without the other's knowledge or consent, is entitled to restitution therefor from the other if he acted unofficiously and with intent to charge therefor.

§ 114. A person who has performed the duty of another by supplying a third person with necessaries, although acting without the other's knowledge or consent, is entitled to restitution from the

other therefor if (a) he acted unofficiously and with intent to charge therefor, and (b) the things or services supplied were immediately necessary to prevent serious bodily harm to or suffering by such person."

The course of the Roman law and the modern civil law of Western Europe, which is based on it, suggests that the common law rule, which we are now discarding in favor of the equitable doctrine, may be merely an instance of early undeveloped law. In the Roman law the duty of a father to support his child was enforced only by criminal proceedings, *Radin, Handbook of Roman Law* 108 (1927), but in the modern civil law the obligation of the parents is direct:

"The duty of taking care of the children's support until such time as they are capable of supporting themselves is primarily incumbent on the father. Their physical care is primarily incumbent on the mother. In the event that the father is indigent the duty to take care of the children's support and in the event of the father's death [the duty to take care of] the children's education in general, is primarily incumbent on the mother. In the event that the mother shall not survive [the father] or is indigent, such duty is incumbent upon the paternal grandparents or, subordinately, on the maternal grandparents." *Austrian Civil Law, sec.* 143.

"Spouses are jointly obligated, by reason of the sole fact of contracting marriage, to feed, support and educate their children." *French Civil Code, Art.* 203.

"Relatives in the line of direct descendants are under the obligation of supporting each other." *German Civil Code, sec.* 1601. "Only the one who is incapable of supporting himself is entitled to support. An infant unmarried child may require his parents to support him although he own property, to the extent to which the income from his property and from his own work are not sufficient for his support." *Ibid., sec.* 1602.

"*Duties towards the Children.*—Marriage imposes upon both spouses the duty to support and to give an education and instruction to the issue. Education and instruction must conform to moral principles." *Italian Civil Code, Art.* 147. "*Contribution to the Burdens.*—The duty of supporting and of giving an education and instruction to the issue is borne by the father and by the mother in proportion to their property, including in the mother's contribution income from her dowry. If the parents do not have sufficient means, such duty falls on the other ascendants according to their order of proximity to the infants." *Ibid., Art.* 148.

"The father and the mother and the child owe each other the care and assistance which are required in the interest of the family."

*Swiss Civil Code, Art.* 271. "The father and the mother shall bear the expenses for the support and education of the child [and they shall share in them] according to their matrimonial regime. If they are in need or if the child causes extraordinary expenses or under other exceptional circumstances, the supervising [judicial] authority may allow the father and the mother to subject the property of the infant child to contribution for his support and education to the extent fixed by it." *Ibid., Art.* 272.

The reason for the early common law rule is to be found in part in the procedural limitations of the common law. The common law was slow in permitting the use of *assumpsit* in suits other than our express contracts or contracts implied in fact, *Ames, Implied Assumpsit,* in *Lectures on Legal History,* 149. *Quasi*-contracts in which the obligation was created by law, *ibid.* 160, were recognized very gradually, *ibid.* 162, and their true nature was even slower in being perceived. Often obligations imposed in law were conceived of as true contracts implied in fact and gradually extended by the use of a fiction to cover obligations implied in law. Thus, it was much easier to imply in law an agency in favor of a neglected wife against her husband, from the fact that wives were commonly agents of their husbands in various affairs, than it was to imply an obligation in law for support in favor of children, who were far less frequently agents of their parents. It was not until the appearance of *Keener on Quasi Contracts* in 1889 that the theory of that subject was elaborated, although Dean Ames outlined the subject in the article above mentioned. There is no reason why the parents' right to the services and earnings of a child should not have supported the parents' obligation to support and educate him, *Osborn v. Allen,* 26 *N. J. L.* 388, 391 (*Sup. Ct.* 1857) to the same degree that the wife's obligation to her husband is deemed in law to support her agency to bind him for necessaries, when he deserts her or consents to their separation, *Emery v. Neighbour,* 7 *N. J. L.* 142, 146 (*Sup. Ct.* 1824); *Vusler v. Cox,* 53 *N. J. L.* 516, 518 (*Sup. Ct.* 1891), or otherwise neglects to furnish her with necessaries, *Sterling v. Potts,* 5 *N. J. L.* 773 (*Sup. Ct.* 1820). There is

no greater danger of injury to the family in the case of the child than in the case of the wife, and the need of a child may be just as great as hers or even greater.

■ Normally suits for the recovery of necessaries furnished a child will be brought in the Law Division, but if the issue of support involves special equities such as a call on the minor's separate estate for contribution, *Alling v. Alling,* 52 *N. J. Eq.* 92, *supra,* or is part of a matrimonial action under *N. J. S.* 2A:34-24, *supra,* the proceeding will be brought in the Chancery Division as heretofore.

### IV. SERVICES RENDERED IN AN EMERGENCY

■ There can be no doubt that the physician plaintiff comes within the terms of *sections* 113 and 114 of the *Restatement of the Law of Restitution* above quoted. The defendants were under an obligation as part of their duty to support and educate their daughter to provide her with medical services both under normal circumstances and in emergencies.

The evidence is uncontradicted that an emergency existed. The parents had refused to provide their child with medical attention with the result that permanent injury would have ensued but for the immediate treatment rendered by the physician plaintiff. Clearly they knew that the services were necessary and that a physician would expect payment for his services. Here the defendants permitted their daughter not only to use the cast and crutches for a month, but to return to the doctor at the end of the month to have the cast removed. Having retained the benefit of the physician plaintiff's services and permitted their daughter to return to him for further services, they are in no position in the circumstances of the case to complain that he acted without notice to them. He did not act officiously, and as a physician in practice of his profession he naturally intended to charge for his services. All the necessary elements are present to impose on the defendants the legal obligation to pay for medical expenses rendered to their child in an emergency.

The judgment below is reversed. Judgment will be entered here in favor of the plaintiff, Dr. Sidney Greenspan, for $45.

*For reversal*—Chief Justice VANDERBILT, and Justices OLIPHANT, BURLING, JACOBS and BRENNAN—5.

*For affirmance*—Justices HEHER and WACHENFELD—2.