705 A.2d 408

MONMOUTH COUNTY DIVISION OF SOCIAL SERVICES FOR
D.M., N/K/A D.W., PLAINTIFF, v. G.D.M., DEFENDANT.

Superior Court of New Jersey
Chancery Division
Family Part
Monmouth County

Decided October 10, 1997

*Thomas H. Klein* for Monmouth County Division of Social Services (*Patrick J. Boyle* on the brief).

*G.D.M.* for defendant, Pro Se.

HAYSER, J.T.C., temporarily assigned.

Does a parent have an enduring and fundamental duty to support his or her children to the maximum degree possible? Alternatively, may a parent deliberately forfeit his or her parental rights, and leave his or her former spouse and/or the State and taxpayers to fulfill the duties which the forfeiting parent may be able, at least in part, to fulfill? Finally, does a custodial parent have standing to waive the right to collect child support at all? These are the principal questions set forth by this case, which intertwines public policy and taxpayer burden issues with the basic family court rubric of the "best interests of the child."

## STATEMENT OF FACTS

The parties in this case were divorced by judgment dated June 30, 1982. On or about July 23, 1985, the judgment of divorce was amended by a consent order which terminated the father-defendant's parental rights, and relieved him of his support obligations for the one child born of the marriage.

Some time after the consent order was entered, the plaintiff-mother and the child began to receive public assistance, in part under *N.J.S.A.* 44:10–1 to 44:10–33. As a part of the application process for such assistance, the plaintiff assigned her rights to collect support for herself and her child to the Monmouth County Division of Social Services (hereinafter "the Division"), as required by *N.J.S.A.* 44:10–2. Now acting as an agent for plaintiff, the Division seeks to vacate the consent order, thus enabling it to seek contribution from the defendant towards support for the parties' child.

The July 23, 1985 consent order provides, at paragraph 2 that defendant "consents to the termination of any and all parental rights he may have with respect to the infant child of the marriage. Furthermore, the defendant shall have no rights of visitation with the infant child of the marriage." At paragraph 1,

the same order provides that plaintiff "waives any and all rights to receive any child support from the defendant for the support and maintenance of the infant child of the marriage." This consent order did not contemplate an adoption of the child by any third party, nor was the State Division of Youth and Family Services (hereafter "DYFS") or any other agency involved.

In seeking to now vacate the consent order, the Division, on behalf of plaintiff, avers that New Jersey law prohibits the termination of parental rights, except in cases of adoption or placement by DYFS. The Division alleges that, in general, private contracts terminating parental rights are unenforceable in this state. In addition, the Division notes that the *Lepis* standard of child support adjustment supersedes any contract which may exist, and that changed circumstances of one or both of the parties allows a re-examination of the support obligations of the parties. It is lastly alleged that because child support axiomatically is intended to benefit the child, a parent cannot effectively waive prospective future rights to such support.

The court, having examined the facts at hand, is inclined to agree with the Division on several levels. At the most basic level, the policy of the Family Part of the New Jersey Superior Court mandates that the best interests of the child or children are a paramount consideration, and will ordinarily supersede any and all competing interests. Inherent in such a policy is an ongoing fundamental duty of all parents to provide support, to the extent possible, to their children. In addition, it is doubtful that a custodial parent has the requisite standing to waive what is essentially the child's right to support. Finally, the placement of a burden created by a private contract on the State, and ultimately the taxpayers, appears to deeply offend public policy. The court will address these concerns individually.

### DUTY OF PARENT TO SUPPORT CHILD

The initial concern regarding the consent order is its apparent disregard for the "best interests of the child" of the

marriage. "The duty of parents to provide for the maintenance of their children is a principle of natural law." *Greenspan v. Slate,* 12 *N.J.* 426, 430, 97 *A.*2d 390 (1953), citing 1 *W. Blackstone Commentaries on the Laws of England* (1765), 435–36 [1].

In keeping with this, New Jersey courts have long held that a parent is bound to provide a child with necessities. See *Tomkins v. Tomkins,* 11 *N.J.Eq.* 512, 517–18 (Ch.1858); *Kopack v. Polzer,* 5 *N.J.Super.* 114, 117, 68 *A.*2d 484 (App.Div.1949), aff'd 4 *N.J.* 327, 328, 72 *A.*2d 869 (1950); *Greenspan, supra,* at 432, 97 *A.*2d 390; *Grotsky v. Grotsky,* 58 *N.J.* 354, 356–57, 277 *A.*2d 535 (1971); *Ionno v. Ionno,* 148 *N.J.Super.* 259, 261, 372 *A.*2d 624 (App.Div.1977); *Lynn v. Lynn,* 165 *N.J.Super.* 328, 342–43, 398 *A.*2d 141 (App.Div.), *certif. denied* 81 *N.J.* 52, 404 *A.*2d 1152 (1979). Today, "[a]s a general rule, a parent is obliged to contribute to the basic support needs of an unemancipated child to the extent of the parent's financial ability irrespective of the quality of the relationship between them." *Martinetti v. Hickman,* 261 *N.J.Super.* 508, 513, 619 *A.*2d 599 (App.Div.1993). Thus, the hopeful common law rule noted in *Greenspan,* above, thereby has become a realistic equitable principle as well.

Other jurisdictions similarly recognize the fundamental duty of every parent to support their children to the degree possible. *Van Valkinburgh v. Watson,* 13 *Johns.* 480, 7 *Am.Dec.* 395 (Sup. Ct.1816); *Dee v. Dee,* 169 *N.Y.S.*2d 789, 792–93, 9 *Misc.*2d 964, 967 (Brx.Cnty.1957) ("It is every child's birthright to be sustained and supported according to the means and station in life of his father."); *State of Connecticut v. Boyd,* 4 *Conn.Cir.Ct.* 544, 548, 236 *A.*2d 476, 478 (1967) ("The duty of a father to support his minor children is one of the most fundamental duties and obligations of life."); *In re Kristina L.,* 520 *A.*2d 574, 579 (R.I.1987);

---

[1] Blackstone's Commentary continues, in pertinent part, "By begetting [the children] therefore they have entered into a voluntary obligation, to endeavor, as far as in them lies, that the life that they have bestowed shall be supported and preserved. And thus the children will have a perfect right of receiving maintenance from their parents ..." *Blackstone, supra,* at 436.

*Blue v. Blue,* 532 *Pa.* 521, 529, 616 *A.*2d 628, 632 (1992); *In re Bruce R.,* 234 *Conn.* 194, 202–03, 662 *A.*2d 107, 112 (1995); *Wills v. Jones,* 340 *Md.* 480, 667 *A.*2d 331 (Md.App.1995) ("This Court has repeatedly recognized, one of the most fundamental duties of parenthood is 'the obligation of the parent to support the child until the law determines that he is able to care for himself,'" quoting *Carroll County v. Edelmann,* 320 *Md.* 150, 170, 577 *A.*2d 14 (1990)).

Some courts have gone so far as to ground the parental duty of support in our federal Constitution. *See, e.g., Pamela P. v. Frank S.,* 443 *N.Y.S.*2d 343, 110 *Misc.*2d 978 (Fam.Ct.1981). That court stated, "[C]learly, the duty of support fits into the legal framework as a reciprocal of the fundamental Constitutional right ·to beget and raise children ... Accordingly, this court views enforcement of the parental support duty as a compelling State interest ..." *Id.* at 347, 110 *Misc.*2d at 984–85, 443 *N.Y.S.*2d 343, citing *U.S.C.A. Const., amend.* 14.

■ The United States Supreme Court has visited the issue, and noted that "[w]hen parents make a commitment to meet those responsibilities [of parenthood], the child has a right to rely on the unique contribution of each parent to material and emotional support. The child therefore has a fundamental interest in the continuation of parental care and support." *Bowen v. Gilliard,* 483 *U.S.* 587, 612–13, 107 *S.Ct.* 3008, 3023, 97 *L.Ed.*2d 485 (1987). This fundamental interest, and the corresponding parental duty, is an inherent part of the "best interests of the child" rubric which underlies our family courts. Today, it is settled that the best interests of the child is the greatest and overriding consideration in any family court matter. *Wilke v. Culp,* 196 *N.J.Super.* 487, 483 *A.*2d 420 (App.Div.1984); *Shambaugh v. Wolk,* 302 *N.J.Super.* 380, 394, 695 *A.*2d 382 (Ch.Div.1996).

In keeping with the predominance of this concept, our courts have recently restated the principles of emancipation of a child, to reflect the ongoing and fundamental duty of parents to support their children. *See, e.g., Filippone v. Lee,* 304 *N.J.Super.* 301, 700

*A*.2d 384 (App.Div.1997). See also, *Bishop v. Bishop*, 287 *N.J.Super.* 593, 671 *A.*2d 644 (Ch.Div.1995); *Quinn v. Johnson*, 247 *N.J.Super.* 572, 589 *A.*2d 1077 (Ch.Div.1991).

These concerns with the interests of children are not merely rhetorical. New Jersey courts have long held that the policy behind case law and statutory requirements should be considered when deciding matters in the family court. *In the Matter of the Adoption of Children by N.M.*, 96 *N.J.Super.* 415, 422, 233 *A.*2d 188 (App.Div.1967); *In re T.*, 95 *N.J.Super.* 228, 236, 230 *A.*2d 526 (App.Div.1967). Thus, family courts are required to consider the "best interests" of the children, including their fundamental right to support, when making any decision which will possibly impact such interests.

None of this is to say that a parent owes a duty greater than he or she can feasibly provide. "The legal liability of the parent necessarily depends upon his or her ability to furnish the maintenance." *Finch v. Finch*, 22 *Conn.* 411 (*Sup.Ct.Er.*1853). The obligation of a parent is obviously limited by that parent's income and overall circumstances. Simply stated, the parent must do what he or she can do to provide for the child or children.

This court, like the above-cited courts, accordingly finds that every parent has a fundamental duty to support his or her children to the greatest extent that they can. In the case at bar, the defendant alleges that he currently has no income, and is presently living principally on his new wife's salary of $7.50 per hour. However, he admits that he has applied for and may soon be receiving disability payments from Social Security.

Regardless of the exact situation, the court is not on balance convinced that the defendant is utterly unable to provide any support at all to his child. Defendant has submitted a handwritten letter objecting to the Division's motion, but has offered no proof of his income or current lack thereof. Under the above case law, it is clear that New Jersey law appropriately authorizes

further investigation into the means available to defendant to provide support to his child.

## ENFORCEABILITY OF CONTRACTS SURRENDERING PARENTAL RIGHTS

Even in the absence of the natural duties of parenthood as traced above, the defendant in this matter would remain subject to New Jersey law's proscription of contracts terminating parental rights. In alleging that the 1985 consent order terminating parental rights is unenforceable, the Division relies in large part on the Supreme Court's landmark decision in *The Matter of Baby M*, 109 *N.J.* 396, 537 *A.*2d 1227 (1988). The *Baby M* case dealt with a surrogate parenting contract, which provided for the termination of the natural mother's parental rights upon birth of the child. The parties had entered a contract without duress or confusion in February of 1985, and that contract was subsequently enforced by the trial court. 217 *N.J.Super.* 313, 525 *A.*2d 1128 (Ch.Div.1987).

In subsequently holding the contract unenforceable, the Supreme Court noted that only when a parent has been declared unfit, an adoption takes place, or DYFS removes a child from a parent, may parental rights be legally terminated under New Jersey law. *Baby M, supra,* at 426, 537 *A.*2d 1227. Even in cases where rights may be voluntarily terminated, this State requires certain very clear documentation of the surrender of rights. *N.J.S.A.* 9:2–16, 17; *N.J.S.A.* 9:3–41; *N.J.S.A.* 30:4C–23. In the absence of these special circumstances and the requisite statutory documentation, a mere private contract terminating parental rights "will not be enforced in our courts. The Legislature would not have so carefully, so consistently, and so substantially restricted termination of parental rights if it had intended to allow termination to be achieved by one short sentence in a contract." *Id.* at 429, 537 *A.*2d 1227.

More recent decisions reinforce the narrow limitations on termination of parental rights and the above edict of our highest Court.

See, *e.g.*, *Matter of Adoption of a Child by D.M.H.*, 135 *N.J.* 473, 641 *A.*2d 235, *cert. den.*, *Hollingshead v. Hoxworth*, 513 *U.S.* 967, 115 *S.Ct.* 433, 130 *L.Ed.*2d 345 (1994); *Matter of A.*, 277 *N.J.Super.* 454, 649 *A.*2d 1310 (App.Div.1994); *R.H. v. M.K.*, 254 *N.J.Super.* 480, 603 *A.*2d 995 (Ch.Div.1991) (holding a property settlement agreement terminating parental rights invalid, and that parents may not voluntarily surrender their parental rights in a context other than the adoption of a child). Likewise, in *Sees v. Baber*, 74 *N.J.* 201, 377 *A.*2d 628 (1977), the Court held that private, unregulated terminations of parental rights are generally not to be enforced. In such a private setting, there is no statutory authorization of the contract, and therefore there is no legal barrier to the retraction of consent or duty under it. *Sees, supra*, at 213, 215, 377 *A.*2d 628.

The present case, like *Baby M* and the other cases cited above, presents a private contract with a simple provision terminating the parental rights of a natural parent, herein the father defendant. None of the necessary documentation was executed, nor could it have been, as this private agreement did not fall under the above-cited statutes. There was neither an agency adoption nor a DYFS action in this case.

Notwithstanding the above, the contract in this matter may at first blush seem to have at least two merits indicating its enforce-ability—namely, the court's authorization and the absence of a private adoption. Neither of these will sufficiently insulate the agreement from voidability under the well-settled principals of law discussed above.

First and most clearly, the authorization of the consent order by the trial court in 1985 is no better, and in fact somewhat less significant, than the trial court's original enforcement of the surrogacy contract in *Baby M*. In that case, the court was reviewing the contract somewhat after the parties entered it. Here, the trial court merely signed off on the parties' alleged agreement, and expressly stated that it had "taken no testimony in regard to the fairness and adequacy of this agreement, but enters

this Order at the requesting consent of the parties." In light of *Baby M,* clearly the court now has authority, and indeed a duty, to find the contract unenforceable.

The second apparent merit to this contract is somewhat more compelling. Where the *Baby M* case and its progeny deal with cases of adoption, the instant case does not. Rather, the father defendant herein merely gave up his parental rights in return for vacation of his child support obligation. However, the court is satisfied that the dicta and holdings of parental rights cases are clearly applicable. Regardless of the specific dynamics of the situation, New Jersey law will not permit private termination of parental rights "to be achieved by one short sentence in a contract." *Id.* at 429, 537 *A.*2d 1227. Accordingly, applicable New Jersey law will not allow the enforcement of the consent order in this matter.

The court notes that this case presents an "inverted" circumstance, in that the party seeking vacation of the agreement is not the party who gave up his or her parental rights. However, again, the policy behind the *Baby M* decision and other case law survives this inversion. The defendant seeks to supersede New Jersey law with the private agreement of the parties. No DYFS action or adoption has occurred. Accordingly, regardless of the various interests of the parties, the surrender of parental rights is unenforceable.

## *CHILD SUPPORT ADJUSTMENT UNDER LEPIS*

The Division, on behalf of the plaintiff, next claims that standard child support precedent also proscribes any permanent enforceability of the 1985 consent order entered in this case. In *Lepis v. Lepis,* 83 *N.J.* 139, 416 *A.*2d 45 (1980), the Supreme Court promulgated an evolutionary standard for support obligation of payor spouses. Under *Lepis,* support orders are inherently limited to the circumstances as they exist at the time the order is entered. Thereafter, a significant change in the circumstances of

either party immediately and always subjects the support obligation to further review or modification. *Id.* at 141, 416 *A.*2d 45.

Under this logic, even assuming *arguendo* that the 1985 consent order were enforceable, it would only be binding while both parties' financial circumstances remained largely as they were at the time that agreement was made. Clearly, neither party asserts that their circumstances are presently the same as they were at the time they entered the consent order.

Defendant has apparently been severely injured, and is seeking supplemental income from Social Security. He has experienced some increases and, finally, the alleged termination of his salary. He has remarried and relocated. His life today is significantly different than it was at the time of the 1985 consent order.

The plaintiff's circumstances are different as well. She has become unemployed, and has for some time been receiving public assistance through *N.J.S.A.* 44:10–1 to 44:10–33 and certain federal programs, including Aid to Families with Dependent Children (AFDC) and its successor program, Temporary Aid to Needy Families (TANF). The child, who was an infant at the time of the consent order, is now in her mid-teens, and is therefore incurring new and different expenses. In sum, it is clear that the circumstances of the case are vastly different than they were when the previous court consented to the order terminating child support.

Therefore, regardless of the alleged permanent nature of the consent order's support arrangement, the above demonstrates that the support obligations, if any, of the parties in this case are ripe for a re-evaluation under *Lepis.* It appears clear that in all reality, little in the Family Part of our Chancery Division is "final." The ever-changing and evolving circumstances of each family unit, be it intact or in some disarray, merits at least occasional review as to support and other obligations. In this respect, every support decision in cases such at this is interlocutory—nothing is genuinely final. To claim that any support order is an immutable, final decision is to largely ignore the human

elements which pervade and often dominate the Family Courts. This applies to support orders based on extensive fact-finding, and to those simply signed off on by a trial court in a consent order.

The court herein has explored the nature of a parent's duty to his or her child, and found that duty to be a natural, vital and fundamental one. Whether the court were to rely on those more fundamental issues or to turn to the *Lepis* rubric as above, the result is the same. It is axiomatic that the parties' respective responsibilities to their daughter may and must at this time be re-evaluated. To hold otherwise would be to authorize *ad hoc* abandonment of a fundamental duty. Parenthood, once embarked upon, is not a dischargeable duty which private parties may dismiss of their own accord.

Not all agreements limiting the support received by a child will be voidable. *Bengis v. Bengis*, 227 *N.J.Super.* 351, 362, 547 *A.*2d 701 (App.Div.1987); *Morris v. Morris*, 263 *N.J.Super.* 237, 245–46, 622 *A.*2d 909 (App.Div.1993). However, the *Bengis* court noted that "[c]learly, where the welfare of the children is concerned, the court has discretion, reasonably exercised, to reject such an agreement." *Ibid.*

The case at bar is clearly distinguishable from the type of case discussed in that part of the *Bengis* decision. While *Bengis* involved a voluntary passing of support duties from a biological parent to an adoptive parent fully capable of supporting the children, this case simply deletes the father's support obligation with no substitute arrangement.

Anti–*Lepis* language as to support may be permissible when parties establish their own standards determining the support obligations for the children. *Morris, supra,* 263 *N.J.Super.* at 245, 622 *A.*2d 909. However, blanket and permanent vacation of a parent's child support obligations constitute "unreasonable standards" which even anti-*Lepis* cases such as *Morris* prohibit. In such cases, and therefore in this case, the court is not bound by the parties' agreement. In the defense of the child's interests, and in keeping with the general *Lepis* standard, this court's

equitable powers supersede the parties' original agreement as memorialized in the 1985 consent order.

Therefore, the reasonable exercise of discretion allowed in *Bengis* when evaluating anti-*Lepis* language and arrangements dictates that this court may reject the consent order herein. "Parties cannot bargain away the court's equitable power." *Lepis, supra,* at 149, 416 *A.*2d 45.

## *STANDING TO WAIVE A RIGHT TO CHILD SUPPORT*

In addition to the above, there is yet another fatal flaw in the 1985 consent order. The plaintiff-mother's actions in that order, like the father's actions, render the contract/order unenforceable. In paragraph 1 of the consent order, plaintiff waives "any and all rights to receive any child support from the defendant, from this day and in the future." This waiver is inherently flawed, and thus infects the consent order *even notwithstanding its various other problems.*

It is a fundamental principal of the Family Division that the right to child support belongs to the child or children, not to the custodial parent. *Kopack, supra,* at 117, 68 *A.*2d 484, aff'd 4 *N.J.* 327, 72 *A.*2d 869 (1950); *Martinetti, supra,* at 512, 619 *A.*2d 599. Therefore, the actions and circumstances of the child, and not those of the parent, are to be evaluated in determining support obligations. *Ibid.* The right to collect arrears for child-related expenses may belong to the custodial parent. *Stanton v. Stanton,* 421 *U.S.* 7, 12, 95 *S.Ct.* 1373, 1376, 43 *L.Ed.*2d 688 (1975) (citing *Anderson v. Anderson,* 110 *Utah* 300, 306, 172 *P.*2d 132, 135 (1946)). However, it is clear that present child support rights lie exclusively with the child for whom they are ordered. The conscience of equity will not permit the present needs of children to be limited by the agreements of their parents. *Wertlake v. Wertlake,* 127 *N.J.Super.* 595, 318 *A.*2d 446 (Ch.Div.1974), *rev'd on other grounds* 137 *N.J.Super.* 476, 349 *A.*2d 552 (App.Div.1975). As noted above, the obligation of all parents to provide, to the degree possible, for their children is fundamental, and can not

therefore be destroyed by the errant, capricious, or uninformed actions of the other parent.

In keeping with these concepts, it is clear that regardless of the unenforceable termination of the defendant's rights in this case, plaintiff, as custodial parent, lacked standing to effectively waive her right to child support, as that support right belongs to the child, and not to that parent.

### PUBLIC BURDEN OF A PRIVATE AGREEMENT

The court next turns to the public effect of the 1985 consent order. In this case and those of its nature, an ostensibly private agreement has significant ramifications in the public forum. Specifically, the 1985 waiver of support, coupled with the custodial plaintiff's present financial status, has placed the support obligation for the child upon the State.

The plaintiff-mother and child in this case are receiving public assistance, at least in part in lieu of the support which would be owing from the defendant-father were it not for the 1985 consent order. This assistance is applied for and administrated under *N.J.S.A.* 44:10–1 to 44:10–33. Included in these statutory provisions is the requirement that any individual applying for public assistance for child support must assign any and all rights to collect such support to the public agency providing the assistance. *N.J.S.A.* 44:10–2, par. 2; *Baylor v. New Jersey Department of Human Services, Division of Public Welfare*, 235 *N.J.Super.* 22, 561 *A.2d* 618 (App.Div.1989), aff'd 127 *N.J.* 286, 604 *A.2d* 110 (1990); 42 *U.S.C.A.* § 601, § 687 (Social Security Administration). The rationale for this provision is obvious—where possible, the taxpayers must be protected from bearing the burden of a debt owed and payable by a private individual.

This policy is embodied not only in the provisions of Title 44, but in many other areas of New Jersey law. See, *e.g.*, *N.J.S.A.* 5:9–13.5, requiring that any owed child support arrears and any amounts owed to public assistance are paid prior to the disbursement of state lottery winnings. In general, the Legislature in-

tends to assure adequate and enforceable support orders for dependents, and to avert the need for public maintenance. *State v. Monroe,* 30 *N.J.* 160, 152 *A.*2d 362 (1959). Public assistance is to be a measure of last resort. To that end, the Legislature has provided a mechanism to enforce support payments. *N.J.S.A.* 2C:24–5; *State v. Savastini,* 14 *N.J.* 507, 516, 103 *A.*2d 249 (1954). Other jurisdictions similarly require parents to reimburse public assistance agencies when possible. See, *e.g., In re Simmons,* 72 *Cal.App.*3d 205, 139 *Cal.Rptr.* 832 (1977); 79 *Am.Jur.2d* Welfare Laws § 91 (1975 & Supp).

It is no great leap in logic to apply this policy to cases such as the present one. Just as the Legislature has taken steps to recoup unpaid child support to protect the taxpayers from non-paying obligors, so too must we protect the taxpayers from unwittingly subrogating private contracts terminating such support.

Other jurisdictions have faced similar circumstances. In *Department of Social Services v. Caro,* 410 *N.Y.S.*2d 360, 65 *A.D.*2d 811 (1978), the plaintiff was receiving public assistance and assigned her support rights to the Department. In the subsequent evaluation of the changed circumstances, the New York Appellate Division sought, for policy reasons, to shift as much of the support burden from the public taxpayers to the appellant as possible. Acting under New York's Family Court Act, § 571, the court was required to hold the public harmless from this private debt as much as possible. *Id.* at 812, 410 *N.Y.S.*2d at 361.

In light of the above, it is clear that the State, and ultimately the taxpayers, are not to be left "holding the bag" when private parties contract themselves out of basic familial obligations. However, this is precisely the situation in this case. Therefore, the parties' consent order in this case is voidable as contrary to public policy. As such the court will allow the Division to seek support from defendant in an effort to insulate the public from bearing the burden of the necessary child support involved in this case.

## *CONCLUSION*

The court is satisfied that on many levels, the agreement embodied in the parties' 1985 consent order is unenforceable. On the most basic level, the agreement of the parties to bargain away their child's rights to two parents and some degree of support offends the most fundamental principles of the parent-child relationship. The right to child support, as discussed herein, is not the parents' to bargain away. Moreover, the contract itself is contrary to New Jersey public policy and precedent, in that it purports to surrender parental rights without the involvement of an appropriate adoption or other agency or a DYFS investigation.

Were it to survive these initial challenges, the consent order is nonetheless superseded by the *Lepis* doctrine, and the inherently interlocutory nature of support orders in the Family Court. Finally, the result of such a contract, were it to be enforced, would be to force the taxpayers of this State to involuntarily subrogate the private contract of the parties. The words and spirit of the legislation and case law cited herein clearly prohibits such a burden on the public.

The parties, particularly the defendant, must not be allowed to bargain away or otherwise evade their responsibilities as parents. In many instances, the freedom of contract and the privacy rights of individuals surely rule. However, the court will not and can not allow such freedoms to jeopardize the "best interests of the child." The consent order entered into by the parties is therefore vacated to the extent that it relieves the defendant of his rights and duties as a parent as his circumstances permit and require him to undertake.

The court is not hereby indicating that the defendant has the ability to pay any amount of child support. Rather, the defendant's support obligation, if any, is to be determined based upon his current financial status and that of the plaintiff. The Monmouth County Division of Social Services is therefore authorized to take the appropriate steps to determine the level of support obligation due from the defendant, if any, and to obtain such

support in the plaintiff's stead, as permitted under the above-cited law.