HALL ET AL., APPELLEES, *v.* ROSEN, APPELLANT.

(No. 76-971—Decided June 8, 1977.)

136

*Mr. D. N. Bodley,* for appellees.
*Mr. Edward C. Benson,* for appellant.

LOCHER, J.  Pivotal to the resolution of the case, *sub judice,* is the question of whether the rule of law formulated in *Miller* v. *Anderson, supra* (43 Ohio St. 473), should continue to be the law in Ohio. The syllabus in *Miller, supra,* reads, in pertinent part, as follows:

"1. The natural father of a child can not be held for its support, under the statutes of this state, if the mother, after the child was begotten, and during pregnancy, contracts a marriage with another man, who marries her with full knowledge of her condition.

"2. By such marriage, the man so marrying, consents to stand in *loco parentis* to such child, and is presumed in law to be the father of the child, and this presumption is conclusive."

The rule of law espoused in *Miller* v. *Anderson, supra,* constitutes a landmark adhered to by a plethora of subsequent decisions. *Wilson* v. *Wilson* (1917), 8 Ohio App. 258; *Kawecki* v. *Kawecki* (1941), 67 Ohio App. 34; *Gustin* v. *Gustin* (1958), 108 Ohio App. 171; *Burse* v. *Burse* (1976), 48 Ohio App. 2d 244.

At its genesis is the common-law presumption of legi-

timacy formulated in response to the Roman legal doctrine of *nullius filius*.[1] Appellees successfully attacked the rule of law formulated in *Miller* v. *Anderson, supra,* in the Court of Appeals as being an anachronism and as being overruled by implication, if not expressly, in *Franklin* v. *Julian* (1972), 30 Ohio St. 2d 228. The Court of Appeals, believing *Miller* v. *Anderson, supra,* to be "actuated by * * * ancient passions and prejudices,"[2] and believing had this court been presented the opportunity in *Franklin* v. *Julian, supra,* the binding precedent of *Miller* v. *Anderson* would have been erased, determined that the granting of summary judgment constituted an error.

There are three compelling reasons for the rejection of appellees' contention and the affirmation of *Miller* v. *Anderson, supra.*

First, the proposition that *Franklin* v. *Julian, supra,* impliedly overruled the *Miller* decision is rejected. In *Romweber* v. *Martin* (1972), 30 Ohio St. 2d 25, this court, in a unanimous decision written by Justice Stern, relied upon *Miller, supra,* in holding, *inter alia,* in paragraph two of the syllabus:

"A man who marries a woman while she is pregnant is presumed in law to be the father of the child, and no formal acknowledgement under R. C. 2105.18 by the father is required in order for such child to inherit."

The absence of a logical foundation for the argument, that this court, while relying on the basic philosophy of *Miller, supra,* in April 1972, would have rejected it in June of 1972 if presented the opportunity, is conspicuous and self-defeating.

The second rationale is implicit in the function of law as revealed by Justice Oliver Wendell Holmes' perceptive definition of law:

"The prophecies of what the courts will do in fact, and nothing more pretentious, are what I mean by the law." Holmes, The Path of the Law, 10 Harvard L. Rev. 457, 460 (1897).

---

[1] *Nullius filius*: Latin, "the son of nobody."
[2] *Franklin* v. *Julian* (1972), 30 Ohio St. 2d 228, 232.

It has long been recognized, and the judicial policy of *stare decisis* derived therefrom, that the law should provide a degree of certainty upon which individuals may rely in the conduct of their affairs. The doctrine of *stare decisis* is the judicial recognition of this need to promote the certainty, stability and predictability of the law.

This case does not present the court with a question of first impression. The resolution of the question occurred in 1885, in *Miller* v. *Anderson, supra.* The statement of law formulated in *Miller* v. *Anderson, supra,* has been accepted not once, but in numerous decisions, the most recent in 1976.[3] On this issue the law has been clear. The rights and liabilities of the individuals have been clearly set out. There has existed a degree of certainty and predictability upon which individuals may rely in the course of their lives. Reliance having been placed on these defined rights and liabilities, they should not now be swept away by mere judicial fiat or pretentions of improvement founded in speculation.

While cognizant of the function of law, this court acknowledges the concomitant requirement of justice—that our adherence to former decisions not be arbitrary, but founded in their continuing reason and logic.

A condition precedent to our scrutiny of the relevance of *Miller* v. *Anderson, supra,* is an understanding of its underlying logic. Behind the principle that a biological father may not be sued for support if another man marries the mother knowing her to be pregnant, is the concept that, by marriage the husband is held to adopt the child at birth into his family, and the law holds him liable for its support, as one standing in *loco parentis*. *State* v. *Shoemaker* (1883), 62 Iowa 343, 17 N. W. 589. In other words, "he is assenting to becoming the father of the child." *Burse* v. *Burse, supra* (48 Ohio App. 2d 244), at page 248. Continuing its analysis of the theory formulated in *Miller* v. *Anderson, supra,* the Court of Appeals stated:

"The serious consequence of the man's act in marry-

---

[3]*Burse* v. *Burse* (1976), 48 Ohio App. 2d 244.

ing a pregnant woman can be compared to that of the man that adopts his wife's child. The fact that the marriage is later dissolved by divorce does not alter the substantial financial and moral obligations resulting from the father-son relationship. * * * "

Thus, the husband has voluntarily assumed the burden of supporting the child. Preventing suit against the biological father does not place the burden of support upon the state, but is consistent with the husband's assent to become the child's father, thereby altering the status, rights and responsibilities of others. The equal protection problem discussed by Justice Schneider in *Franklin* v. *Julian, supra,* is not applicable because in this case there is no denial to this child, as existed in *Franklin* v. *Julian, supra,* of a civil remedy to enforce the duty of support arising from father-hood. Conspicuous by its absence from the record is any attempt to collect child support from Ross, the legally recognized father.

Nor is Ohio alone in holding the husband to a continuing duty to support after termination of the marriage. A survey of jurisdictions, wherein the courts have held the duty to support based on marriage ends with the marriage, reveals the use of a variety of other grounds upon which the husband is held liable for the continued support of the child. In Florida, California, the District of Columbia and Virginia, the courts have expressed their willingness to hold the husband to a duty of support under a theory of contract or estoppel. *Taylor* v. *Taylor* (Fla. App. 1973), 279 So. 2d 364; *L.* v. *L.* (Mo. App. 1973), 497 S. W. 2d 840; *Clevenger* v. *Clevenger* (1961), 189 Cal. App. 2d 658, 11 Cal. Rptr. 707; *Fuller* v. *Fuller* (D. C. App. 1968), 247 A. 2d 767; *T.* v. *T.* (1976), 216 Va. 867, 224 S. E. 2d 148.

The Supreme Court of Virginia, in *T.* v. *T., supra,* held, at page 873:

"We believe that the husband's promise to the wife, in reliance upon which she changed her position, acted to her detriment, and substantially performed her obligations until her husband made further performance impossible, have estopped him from pleading the statute of frauds. Ac-

cordingly, we hold that the wife has established an enforceable express oral contract by the husband to continue to support the child as if he were the natural father of the child. In view of this holding, we find it unnecessary to consider other theories advanced by the wife under which liability might be established in other jurisdictions."

Thus, the duty to support continued after the marriage because of a voluntary oral promise to support the child and the wife's reliance upon this promise. Under *Miller* v. *Anderson, supra* (43 Ohio St. 473), the husband, by agreeing to marry a woman whom he knows to be *enceinte,* is assenting to become the child's father and to assume the burden of support. Legal semantics aside, the difference between the expectation expressed orally in *T.* v. *T., supra,* and the expectation expressed by the actions of two people assenting to marriage and the creation of a family for a child already conceived is elusive. By this act of marriage, the man promises not only to shoulder the mantle of a husband, but also of a father, and the woman expresses her reliance upon the promise. To infer from this action anything to the contrary is to scoff at human nature and common sense.

Rejection of the long-accepted policy proclaimed by *Miller* v. *Anderson, supra,* should be undertaken only with a comprehension of the inherent evils to be aroused by such a course. The possible harm is not merely the illegitimation of a heretofore legitimate child, but the disruption of the normal psychological and sociological relationship between father and child which is nurtured by support and association. The creation of an invitation to bring support actions against alleged biological fathers, perhaps many years after the fact, portends the possibility of "father-shopping," *i. e.,* seeking support from the most successful of possible candidates. These actions will not only present the problem of the staleness of the evidence, but also the possibility of disrupting other established families by moral disparagement and suddenly increased financial responsibilities. Invitation of these evils is not a sagacious action.

We believe the basic principles of law formulated in *Miller* v. *Anderson, supra,* are of continued utility and validity and, therefore, are determinative of this action. Accordingly, the judgment of the Court of Appeals is reversed.

*Judgment reversed.*

HERBERT, CELEBREZZE and P. BROWN, JJ., concur.
O'NEILL, C. J., W. BROWN and SWEENEY, JJ., dissent.

WILLIAM B. BROWN, J., dissenting. By holding as a matter of law that men marrying women with the knowledge that they are pregnant by someone else agree to stand in *loco parentis* to the unborn offspring, the majority opinion endorses a *conclusive presumption* of paternity and deprives children conceived out of wedlock of a source of support from their natural fathers. Because I have serious reservations about the validity and consequences of the majority's holding, I dissent.

### I.

To begin with, there is no correlation between the results of the majority's holding and the weight traditionally accorded the interests of those directly or indirectly affected by support proceedings. The interests most frequently invoked under facts like those of the instant cause are those of the child, who is neither responsible for his predicament nor capable of protecting himself, and the state, which is responsible for the child's welfare if other sources of support are not available. (*Francken* v. *State* [1926], 190 Wisc. 424, 436, 437, 209 N. W. 766, 770.) By denying the child a right to receive support from his natural father, the majority opinion limits the child's private sources of support, increases the possibility that he will become a public charge and defeats the interests of both child and state. Moreover, by declaring the mother's husband to be the child's sole source of support payments, the majority ignores any moral duty owed by the biological father (*Carter* v. *Krise* [1859], 9 Ohio St. 402, 405), and rewards the natural father for his indifference while it

penalizes the husband for marrying the child's mother. Finally, not only does the majority holding penalize the child, the state and the husband while it protects the natural father from the consequences of his meretricious acts, but, because this court has granted the illegitimate child conceived *in wedlock* the right to sue his natural father for support in a civil action (*Franklin* v. *Julian* [1972], 30 Ohio St. 2d 228), the majority holding also promotes the unequal treatment of adulterine and nonadulterine illegitimates and their putative and natural fathers.

In addition, the majority's holding may well run afoul of the Due Process Clause of the Fourteenth Amendment. When the majority frees biological fathers from any duty of support by declaring those men who marry pregnant women to be the fathers of the women's offspring, it engrafts onto Ohio's support statutes a conclusive presumption of paternity which bears no rational relationship to the state's interest in procuring private support for illegitimates and which may be unconstitutional.

"* * * [p]ermanent irrebuttable presumptions have long been disfavored under the Due Process Clauses of the Fifth and Fourteenth Amendments," especially when they are "not necessarily or universally true in fact, and when the state has reasonable alternative means of making the crucial determination." *Vlandis* v. *Kline* (1973), 412 U. S. 441, 446 and 452. Since common sense dictates that a man's temporary concern for an unwed mother does not necessarily include a permanent concern for the welfare of her offspring, and since the state has the means of determining whether a husband is actually the father of his wife's child and whether he intended, by marrying her, to assume the responsibility for her illegitimate offspring, the conclusive presumption implicit in the majority opinion constitutes a denial of due process under the Fourteenth Amendment.

## II.

Perhaps because of the anomalous and possibly unconstitutional results which it produces, there is very little legal support in this or other jurisdictions, for the majority's holding. A presumption of legitimacy arising from

birth in wedlock was recognized at common law (see 1 Blackstone's Commentaries 457-458 [1765]), and exists in virtually every American jurisdiction (annotation, 57 A. L. R. 2d 729, 732), but that presumption has generally been held to be rebuttable (annotation, 57 A. L. R. 2d 729, 732, 739). Indeed, nowhere is its rebuttable quality more evident than in those jurisdictions, cited by the majority, which have turned to theories of estoppel or express contract to bar *individual* husbands, who expressly committed themselves to supporting the child as well as the mother, from rebutting the presumption. (See *Clevenger* v. *Clevenger* [1961], 189 Cal. App. 2d 658, 11 Cal. Rptr. 707; *T.* v. *T.* [1976], 216 Va. 867, 224 S. E. 2d 148, and, in general, annotation, 90 A. L. R. 2d 583.)

Ohio's precedent for the majority's holding is also scanty. *Miller* v. *Anderson* (1885), 43 Ohio St. 473, which the majority opinion approves and follows, is almost one hundred years old and certainly displays the "ancient passions and prejudices" which this court recently criticized in *Franklin* v. *Julian, supra,* at page 232. Moreover, the facts of the *Miller* case provide much stronger support for a presumption of paternity than do those of the instant cause since the husband in that case lived with the mother until his death and fathered a child by her after their marriage. Finally, the *Miller* opinion runs counter to a number of cases declaring the presumption of paternity in cases substantially similar to the instant cause to be rebuttable. See *Powell* v. *State, ex rel. Fowler* (1911), 84 Ohio St. 165; *State, ex rel. Walker,* v. *Clark* (1944), 144 Ohio St. 305; and *Franklin* v. *Julian, supra.* (The holding of *Romweber* v. *Martin* [1972], 30 Ohio St. 2d 25, is inapposite because the husband in that case was also the child's natural father.)

Given the weak precedent supporting the majority opinion, and the anomalous and possibly unconstitutional results which it produces, I respectfully dissent.

O'NEILL, C. J., and SWEENEY, J., concur in the foregoing dissenting opinion.