100 N.J. 567 (1985)
498 A.2d 775
M.H.B., PLAINTIFF-RESPONDENT,
v.
H.T.B., DEFENDANT-APPELLANT.
The Supreme Court of New Jersey.
Argued January 8, 1985.
Decided October 11, 1985.
*568 Michael C. Morris argued the cause for appellant (Morris and Brock, attorneys).
M.H.B. argued the cause pro se.
PER CURIAM.
The members of the Court being equally divided, the judgment of the Appellate Division is affirmed.
HANDLER, J., concurring.
We have recently recognized that upon a divorce, one spouse may be obligated under principles of equitable estoppel to provide financial support for his or her stepchildren who are the children of the other spouse. Miller v. Miller, 97 N.J. 154, 167, (1984). In this appeal, we consider the circumstances that can give rise to an equitable estoppel forbidding a divorced stepparent from denying the validity of a previous voluntary commitment to provide financial support for a stepchild. The child in this case was born while the defendant was married to the child's mother. However, the defendant knew shortly after the child's birth that he probably was not her natural father. Nevertheless, throughout the marriage and for five years following the divorce, the defendant consistently conducted himself as the child's father, successfully gained the child's love and affection, and established himself as the little girl's parental provider of emotional and material support. Under such circumstances, I believe that the stepfather is obligated to provide continuing financial support for his stepchild.

*569 I.
The parties in this case (referred to by their initials or first names in order to protect the child who is the object of the controversy) were married in 1966. The couple settled in New Jersey where, during their first five years together, they conceived two sons, G.B. and M.B. The marriage turned sour during 1975, however, and sometime thereafter the plaintiff-wife, Marilyn, had a brief extra-marital affair. In 1977, while still married to the defendant-husband, Henry, Marilyn gave birth to a daughter, K.B.
Three months later, Henry first learned that he might not be K.B.'s biological father. He discovered a letter, or a diary entry, implicating Marilyn's former paramour as K.B.'s natural father. Henry then confronted Marilyn with this evidence of her infidelity, and moved out of the family residence. Following this separation, the marriage continued for almost three years. After living for six months in the same town as the rest of his family, however, Henry moved twice, first to California and then to Wisconsin, where he continues to live. During this period of separation, Henry maintained close bonds with all of the children, K.B. as well as the two sons, through phone calls, letters, gifts, and visits.
Marilyn also moved several times with the children. Between March and September 1978, she cohabitated with her erstwhile paramour, K.B.'s purported natural father, whom she briefly considered marrying. In December 1978, however, Marilyn brought herself and the children to Henry's home in Wisconsin, and for six months the parties attempted to reconcile their differences. Henry then professed to Marilyn that he would always love K.B., and that he did not want the child's illegitimacy to interfere with the couple's future together.
The reconciliation attempt failed, however, and, in June 1979, the couple signed a separation agreement covering financial support obligations, child custody, and visitation. Marilyn assumed custody of all three children, then ages 2, 7, and 10, and *570 Henry undertook to pay $600 per month as family support, based on his annual income of over $34,000 at a time when Marilyn had no income. Marilyn thereafter moved back to New Jersey with all three children.
It is undisputed that K.B.'s purported father then lived and still lives nearby to the child and her mother. Marilyn testified, however, that she last saw this man in December 1979, six months after returning to New Jersey, and has not seen him since. Further, although after the separation Marilyn dated several men, none, including the alleged natural father, ever replaced Henry as a father-figure to K.B.
In March 1980, the couple obtained a divorce in Wisconsin under terms established by an extensive written settlement agreement. The parties, Henry as well as Marilyn, stipulated that all three children were born of the marriage. They further agreed that Marilyn would have custody of the children during the school year, and that Henry would get custody during the three summer months. Although at this point Henry earned about $51,000 each year while Marilyn still had no income, Henry promised only to continue paying $200 per month per child in Marilyn's custody. These payments would have totalled about $5,400 annually if three children had lived with their mother for nine months each year; however, by the parties' agreement, M.B. lived with his father for most of the post-divorce period, and therefore Henry's annual support obligation came to about $3,600. No alimony was awarded, and the couple's remaining, limited assets were divided in half.
All three minor children remained objects of Henry's affection, attention, and solicitude throughout the post-divorce period. In particular, Henry expressed interest in and concern for K.B. As found by the trial judge,
K.B. bears Henry's surname, is registered on all of her records as bearing his surname, knows no other father, and is ignorant of the facts surrounding her paternity. Henry made innumerable representations to K.B. and to the world that he was her father. * * * The testimony related many tender moments *571 between father and daughter. He sent her roses on her birthdays and comforted her in his bed during thunder and lightening storms.
Thus, Henry treated K.B. exactly as he treated his own son G.B., who was also in Marilyn's custody. Both K.B. and G.B. received Christmas gifts in 1979, 1980, and 1981. Further, Henry willingly provided child support payments on behalf of both children through the end of 1981. Based on all of the evidence, the trial judge concluded that Henry had become K.B.'s "psychological, if not biological parent."
Then, in March of 1981, Henry remarried. The following summer, both K.B. and G.B. visited and remained with Henry. By September 1981, however, Marilyn and Henry's second wife did not get along. The relationship between Marilyn and Henry deteriorated and Henry began withholding child support payments.
In January 1982 Henry petitioned a Wisconsin court to grant him custody of all three children, including K.B. The Wisconsin judge transferred the case to the New Jersey courts based on the children's best interests and the absence of local jurisdictional prerequisites. Marilyn filed a separate complaint, in March 1982, in New Jersey, seeking to retain custody of G.B. and K.B., and to obtain an increase in child support. Consistent with the petition he had filed in Wisconsin, Henry filed a counterclaim requesting custody of these children, K.B. as well as G.B. Later, by a pre-trial motion, Henry amended his counterclaim, claiming, in the alternative, that he should be under no duty to provide child support for K.B., and seeking to litigate the issue of the child's paternity. This was the first time that Henry had ever attempted to repudiate his paternal relationship with K.B. Without conceding Henry's right to contest paternity, Marilyn consented to allow the completion of Human Leucocyte Analysis blood test in December 1982. The results of the test excluded Henry as K.B.'s biological father.
A plenary hearing on the custody and support applications took place over several days in April and May of 1983. In addition to the foregoing facts, including Henry's knowledge in *572 1977 that he might not be K.B.'s natural father, the trial judge found that
[i]t is clear Henry intended to be K.B.'s father and that she relied on that fact. * * * Even Henry's [second] wife * * * described Henry's relationship with K.B. as that of "a loving father-daughter relationship." * * * K.B. relied upon Henry's representations and has treated H.B. as her father, giving to him and receiving back from him all of the love and affection that the parent-child relationship should naturally evoke.
Henry is certainly K.B.'s psychological, if not biological parent. * * * Henry is the only father K.B. knows or has ever known. * * * To permit Henry now to repudiate his intent to support K.B. * * * would cause irreparable harm to the child.
Based on these findings, the trial judge concluded that the doctrine of equitable estoppel was applicable to preclude Henry from denying the duty to provide child support on behalf of K.B. This aspect of his decision was affirmed by a divided court in the Appellate Division, and presents the sole issue on the appeal that Henry filed with this Court as of right under R. 2:2-1(a).

II.
The framework for analysis of the issue on this appeal is provided by Miller v. Miller, 97 N.J. 154 (1984). In that case, the Court recognized that the doctrine of equitable estoppel could properly be applied in the context of a matrimonial controversy in which the interests of individual children were at stake. Because we were dealing with responsibilities that may flow from familial relationships that are inherently complicated and subtle, we acknowledged that the application of equitable principles called for great sensitivity, caution, and flexibility.
The Miller case involved two girls whose mother remarried after divorcing their father. During the mother's second marriage the defendant, her second husband, assumed sole responsibility for the girls' financial support, as well as other parental privileges and obligations. He also discouraged his wife and stepchildren from maintaining any personal or financial relationship with the children's natural father. The second marriage ended in divorce after seven years, at which time the *573 mother sought to receive continuing child support from the girls' stepfather.
The Court ruled in Miller that, before a duty of child support could be imposed based on equitable considerations, it must first be shown that, by a course of conduct, the stepparent affirmatively encouraged the child to rely and depend on the stepparent for parental nurture and financial support. We specifically recognized that such conduct could interfere with the children's relationship to their natural father. Under the facts, we held that the stepfather would be equitably estopped to deny his duty to continue to provide child support on behalf of his stepchildren, if it could be shown that the children would suffer financial harm if the stepparent were permitted to repudiate the parental obligations he had assumed. We further held that the natural father could continue to be legally liable for the support of these children. Id. at 169-70.
Applying the principles set forth in Miller, the evidence in this case compels the imposition of equitable estoppel to prevent Henry from denying the duty to provide financial support for K.B. Henry's actions throughout the marriage and following the divorce constituted a continuous course of conduct toward the child that was tantamount to a knowing and affirmative representation that he would support her as would a natural father. By both deed and word, Henry repeatedly and consistently recognized and confirmed the parent-child relationship between himself and K.B. He acted in every way like a father toward his own child. He also stipulated to the child's paternity. At the time of his divorce he promised to pay child support, which obligation was incorporated into the judgment of divorce.
The volitional nature of Henry's conduct is underscored by Henry's persistent attempts to gain custody of K.B., efforts that he continued on appeal from the trial court's award of custody to Marilyn. He thus sought child custody even after blood tests conclusively demonstrated that, biologically, he was *574 not K.B.'s father. Consequently, there can be no suggestion that Henry's prior actions were merely accidental or inadvertent. His actions attest to the previously well-developed father-daughter bond, and convey all possible indicia of an affirmative and purposeful representation of continuing support, which constitutes a primary element of equitable estoppel.
There was clearly reasonable reliance upon Henry's purposeful conduct. The obvious expectations engendered by Henry's conduct were that K.B. fully accepted and reasonably believed Henry to be her father. Significantly, the court found that Henry became K.B.'s psychological father, a finding that imports much more than mere affection. See generally Goldstein, Freud & Solnit, Beyond the Best Interests of the Child 9-28 (1973). The strength and durability of a psychological parent-child relationship is perhaps the most relevant consideration in defining a child's best interests. See e.g., Sorentino v. Family and Children's Soc'y of Elizabeth, 72 N.J. 127, 132-33 (1976); Hoy v. Willis, 165 N.J. Super. 265, 272-77 (App.Div. 1978). Further, it is not disputed that K.B. never knew any person other then Henry to be her natural father. As found by the trial judge, Henry's absorption of the child's time and affection as her father effectively stultified the development of any other filial relationship between K.B. and anyone else.
In these circumstances, Henry's conduct assuredly engendered material and emotional consequences for K.B.  consequences that would be demonstrably adverse to K.B. if Henry were now permitted to repudiate all his prior actions. This becomes understandable upon a consideration of the nature of filial bonding. See Sorentino v. Family and Children's Soc'y of Elizabeth, supra. This bonding is indispensable in fostering the optimum psychological and emotional development of the child because it is the vehicle of parental love. This love of the parent for the child is a cohesive that binds parent and child and, further, gives unique strength and durability to the natural loyalty that the parent holds for the child. The parent-child bond thus serves to anchor the material and financial, as well *575 as emotional, support that are vital to the well-being of a child. In this frame of reference, the critical factor is K.B.'s total filial dependence on Henry. Were Henry permitted to disavow the parent-child relationship that he created and fostered and to repudiate the parental responsibility that flowed from that relationship, K.B. would suffer demonstrable harm fully commensurate with her dependent condition.
The detrimental character of reliance in such situations has led courts to impose an estoppel against a man whose wife gives birth to another man's child if the husband then knowingly "represents himself to both the child and the community as the natural father." Miller, supra, 97 N.J. at 165 (citing Clevenger v. Clevenger, 189 Cal. App.2d 658, 11 Cal. Rptr. 707 (Dist.Ct.App. 1961); Hall v. Rosen, 50 Ohio St.2d 135, 363 N.E.2d 725 (1977)); see also id. 97 N.J. at 166 (citing In re Marriage of Valle, 53 Cal. App.3d 837, 126 Cal. Rptr. 38 (Ct.App. 1975) (equitable estoppel imposed where children who have relied on stepparents for continuing support are cut off from the love of biological parents or other potential adoptive parents); Wener v. Wener, 35 A.D.2d 50, 312 N.Y.S.2d 815 (App.Div. 1970) (same); cf. T. v. T., 216 Va. 867, 224 S.E.2d 148 (1976) (contractual theory of child support based on a past promise of support); L. v. L., 497 S.W.2d 840 (Mo. Ct. App. 1973) (same).
In Ross v. Ross, 126 N.J. Super. 394 (J. & D.R.Ct. 1973), aff'd, 135 N.J. Super. 35 (App.Div. 1975), discussed at length in Miller, 97 N.J. at 163-64, the defendant had married the child's mother eighteen months after the birth of her child. During the support hearing following the subsequent breakdown of the marriage, it was established that the child, then seven years old, believed that the defendant was his natural father. The court rejected the husband's argument that he was not obligated to support the child. In applying the doctrine of equitable estoppel, the court stressed that the defendant by his conduct actually represented himself to the child as his father and that the child sincerely believed that defendant was his father. 126 N.J. Super. at 400. We pointedly observed in Miller that were *576 the court to have reached any other conclusion, it would result in "irreparable harm and inflict deep injury on the child, the true party in interest." 97 N.J. at 164.
Similarly, in A.S. v. B.S., 139 N.J. Super. 366 (Ch.Div. 1976), aff'd, 150 N.J. Super. 122 (App.Div. 1977), also extensively treated in Miller, 97 N.J. at 164-65, the child was raised by the parties as their own from the time he was one month old. The parties separated nine years later, and, in a proceeding by the wife against the husband for support of this child, the court found that the husband was estopped from denying his parental obligation to continue to support the child. We again stated that any result that would have allowed the putative father to repudiate his responsibility "would do irreparable harm to the child," 97 N.J. at 164, and further emphasized this understanding of detrimental reliance by quoting from A.S. v. B.S., 139 N.J. Super. at 371-72, the following passage:
[The child] is the real party in interest in this proceeding. To permit defendant to repudiate his intent to support the child and no longer stand in loco parentis to him would cause irreparable harm to the boy. He would be without familial roots, without a known heritage. Equitable estoppel must be applied in this instance to prevent that result.
[97 N.J. at 164]
In the present case the trial court found that K.B. would suffer "irreparable harm" if Henry were allowed to repudiate his actions. As so well expressed in Clevenger, 11 Cal. Rptr. at 710, which we quoted in Miller, 97 N.J. at 165,
[t]here is an innate immorality in the conduct of an adult who for over a decade accepts and proclaims a child as his own, but then, in order to be relieved of the child's support, announces, and relies upon his bastardy. This is a cruel weapon, which works a lasting injury to the child and can bring in its aftermath social harm. The weapon should garner no profit to the wielder; the putative father should earn no premium by the assertion of the illegitimacy of the child.
I am satisfied, as was the trial court, that the evidence in this case establishes that Henry, from the time of K.B.'s birth, engaged in a voluntary and knowing course of conduct with respect to K.B., which constituted in its purpose and effect an affirmative representation that he was her natural father. It is also abundantly clear that the child K.B., as well as her mother *577 Marilyn, relied upon Henry's purposeful conduct and depended upon him for support. Further, it cannot be disputed that the reliance by K.B. was detrimental in the sense of the financial, as well as personal, harm she would suffer if Henry were permitted to disavow his representations, repudiate the expectations he created, and evade the responsibilities he had assumed. Under these circumstances he is equitably estopped from denying a continuing obligation to provide child support on behalf of K.B.[1]

III.
Defendant cites two reasons why he should not be responsible for his stepchild's financial support. He urges that the New Jersey Parentage Act, N.J.S.A. 9:17-38 to -59, requires that if a man is found not to be a child's biological father, then he cannot be held liable to support that child, at least if the biological father may be identified. Defendant also contends that Miller stands for the proposition that Marilyn had a duty to bring the purported natural father into court and that, because she did not, we should remand to consider whether that person should be liable for K.B.'s support. Neither argument is persuasive.
With respect to the argument based on the New Jersey Parentage Act, N.J.S.A. 9:17-45a provides that "a man alleged * * * to be the father [of a child] * * * or any person with an interest recognized as justiciable by the court may bring * * * *578 an action * * * for the purpose of determining the existence or nonexistence of the parent and child relationship." N.J.S.A. 9:17-45d further provides that "[r]egardless of its terms, an agreement, other than an agreement approved by the court in accordance with [N.J.S.A. 9:17-48c] between an alleged or presumed father and the mother of the child, shall not bar an action under this section." Henry alleges that these provisions shield him, as a stepparent, from child support obligations.
The statute, however, draws a distinction between paternity and the duty of support. See N.J.S.A. 9:17-55a; see also N.J.S.A. 9:17-41d (natural parent's rights may be terminated); cf. N.J.S.A. 9:17-44a (a husband can agree to support a child of artificial insemination). The statute also recognizes the need for flexibility in determining child support. Thus, under N.J.S.A. 9:17-53c, after a court determines paternity and clarifies birth records, "[t]he judgment or order may contain any other provision directed against the appropriate party to the proceeding, concerning the duty of support, the custody * * * of the child, visitation privileges * * *, or any other matter in the best interests of the child." (Emphasis added.) This provision assures that in custody and support cases the children's best interests trump any determination of parentage. See In re Adoption of B., 152 N.J. Super. 546, 554 (Cty.Ct. 1977). Clearly the Legislature did not intend to preclude the equitable imposition of a duty of child support upon a stepparent when the evidence assessed in accordance with principles of equity demand that result.
With respect to the other contention, in Miller there was undisputed evidence of a pre-existing and continuing relationship between the natural father and the daughters prior to the mother's remarriage to the defendant stepfather. There was also considerable testimony regarding the continuing viability of that relationship. In this case, by contrast there is no competent evidence as to K.B.'s actual parentage. Moreover, the uncontroverted testimony revealed no contact whatsoever between K.B. and her alleged natural father, nor any inkling on *579 K.B.'s part that Henry was not her actual father. In addition there was evidence in Miller that the natural father had acknowledged in the past his financial ability and willingness to support his daughters. There is no comparable evidence in this case.
We recognized in Miller that a natural parent ordinarily is the primary source of financial support of a child, and that such a legal obligation is not abrogated by imposing a current obligation of child support upon a stepparent under principles of equitable estoppel. 97 N.J. at 169. In that case, the Court felt it would be in the best interests of the child to consider whether the natural father, if available, should be made to honor his legal obligation to support his children. In this case, the circumstances are markedly different because no person, other than Henry, has ever emerged in K.B.'s life as her father.
A determination to affix a present obligation upon a stepfather does not in any way mean that we exonerate or condone a biological father who abdicates his responsibility to support his child. I fully acknowledge the statutory and common law requirement that the primary responsibility of child raising and support is that of the natural parent. Consequently, any decision to impose liability for child support on a stepparent must recognize the exceptional nature of such relief, as we have done in this case. Accord Miller, 97 N.J. at 169.
Notwithstanding the existence of exceptional circumstances and an equitable basis to impose a child support obligation on a child's stepparent, that relief remains mutable; it is subject to changing circumstances as these may affect the child's best interests. Indeed, in appropriate cases a stepparent, or any other person entitled to represent the interest of the child, may demonstrate the existence of changed circumstances justifying the assumption of liability for child support by the biological parent. That assumption of child support will be required if changed circumstances show that it would be in the best interest of the child, fair to the stepparent, and legally just as *580 to the biological father. The record in this case, however, does not present these issues, and hence we cannot deal with them further.

IV.
For the reasons expressed, I would affirm the judgment below. Chief Justice Wilentz and Justice O'Hern join in this opinion.
POLLOCK, J., concurring in part and dissenting in part.
As Justice Handler's concurrence acknowledges, this case is controlled by our opinion last term in Miller v. Miller, 97 N.J. 154 (1984), which was published after the judgment of the Appellate Division. Miller recognized that the primary duty to support a child rests on the natural parent, but that in certain circumstances a stepparent could be estopped to deny such a duty. Specifically, we stated in Miller that it is only when a stepparent "actively interferes with the children's support from their natural parent that he or she may be equitably estopped from denying his or her duty to support the children." Id. at 169. Today's concurring opinion, however, would impose on a stepparent a duty of support not on the basis of estoppel but of a perceived emotional bonding between stepparent and child. From that premise, the opinion then proceeds to force the facts of the present case within its expanded interpretation of Miller.
I believe that the expansion of the Miller opinion is unwise and unnecessary. I further believe that the better practice would be to remand the matter to the Chancery Division for reconsideration in light of Miller. Pending that determination, I would continue to require Henry to support K.B.

I
As the concurring opinion indicates, Marilyn and Henry were married in 1966, and they conceived two sons, G.B. and M.B. In June 1976, Marilyn began an extramarital affair with K.B.'s *581 natural father, and on March 15, 1977, K.B. was born. Three months later, in June 1977, Henry learned that he might not be the father of K.B. Those suspicions were confirmed when, in the course of this litigation, a human leucocyte analysis (HLA) blood test established that Henry was not the father of K.B. Significantly, all of the events supporting the "emotional bonding" between K.B. and Henry occurred before confirmation of the fact that Henry was not K.B.'s father.
Furthermore, on learning of Marilyn's liaison with K.B.'s natural father, Henry separated from her. Although he continued to live in the area for six months, Henry moved to California and then to Wisconsin, where he still resides. At one time, in an unsuccessful attempt to save his marriage, he brought his family, including K.B., to Wisconsin for six months. Thereafter, Henry's only contacts with K.B. were for two-month visitation periods in the summer of 1980 and 1981, and a one-month visit in the summer of 1982. Since that time, Henry has ceased all communication with his stepdaughter. In the eight years that have elapsed since K.B.'s birth, Henry has spent a total of only fourteen months with her. Moreover, Henry has since remarried and begun a new family, one in which the trial court found K.B. is not welcome. Thus, Henry's relationship to K.B., which was always ambivalent, is now in tatters. Consequently, I believe that the present case is a poor vehicle to transport into the law the notion that emotional bonding between a stepparent and a child may terminate a natural parent's support obligation.
For her part, Marilyn knows the identity of K.B.'s purported natural father. Furthermore, after K.B.'s birth, Marilyn cohabited with the natural father for about six months. She discussed with the natural father not only his paternity of K.B., but also the prospect of marriage. Ironically, during most of her life, K.B. has lived in closer geographic proximity to the purported father than to Henry. Indeed, the natural father still lives in a neighboring community, where he is engaged in the florist business.
*582 Notwithstanding the contentions of the concurring opinion to the contrary, the record is devoid of any proof that Henry directly interfered with the natural father's relationship with K.B. In this regard, the facts of the present case differ from those in Miller, where the stepparent actively interfered with the natural parent's attempt to support his children. For example, the stepfather in Miller tore up the natural father's support checks, which eventually induced the natural father to discontinue his support payments. 97 N.J. at 160. Here, the natural father has never claimed K.B. as his child and has been content to allow Henry to support her. The tragic fact is that neither Henry nor the natural father has spent much time with K.B.

II
Although the concurrence purports to rely on Miller v. Miller, supra, it actually stands the Miller opinion on its head. Miller recognized "that in appropriate cases, the doctrine of equitable estoppel may be invoked to impose on a stepparent the duty to support a stepchild after a divorce from the child's natural parent." Id. at 170. We admonished, however, that the doctrine was to be invoked "cautiously." Id.
Accordingly, we held that a stepparent could be equitably estopped from denying an obligation to support a stepchild on proof of three conditions. First, the stepparent must have made a representation to either the children or the natural parent that he or she would provide support. Second, that representation must have been relied on by either the children or the natural parent. Id. at 168. We declined to rely on these two conditions alone to establish estoppel because such a rule would penalize a "stepparent who tried to create a warm family atmosphere with his or her stepchildren." Id. Consistent with that concern, we imposed a third condition, one that required a showing that "the children will suffer future financial detriment as a result of the stepparent's representation or conduct *583 that caused the children to be cut off from their natural parent's financial support." Id. at 168-69. Such financial detriment could be shown if the custodial parent cannot locate or does not know the whereabouts of the natural parent, or cannot obtain legal jurisdiction over the natural parent, and the natural parent's unavailability is attributable to the actions of the stepparent. Thus, a stepparent is responsible for the unavailability of a natural parent only when he or she takes "positive action interfering with the natural parent's support obligation." Id. at 170. Accordingly, in Miller, we remanded the matter to the trial court to determine whether the stepfather had detrimentally affected his stepchildren's ability to obtain future support by interfering with the children's relationship with the natural father.
In his separate opinion, Justice Handler emphasized that
the critical focus should not be on whether defendant represented himself as the natural father of the children or whether the children came to love their stepfather as if he were their natural parent. Rather, the concern should be whether, by word and deed, defendant affirmatively encouraged, and actually succeeded in attaining, the family's financial dependence on him and, further, whether defendant deliberately and aggressively cut off the support that the children had been receiving or might have received from their natural father.
[Id. at 174 (Handler, J., concurring and dissenting).]
Justice Handler urged that
the love between defendant and the stepchildren is not the pivotal consideration. The gist of the equitable cause of action here is rooted in the fact that defendant affirmatively established himself as the sole or primary supporter of the family and zealously deprived his stepchildren of the support they were otherwise entitled to secure from their natural father.
[Id.]
Thus, both the majority and separate opinions in Miller acknowledged that the primary obligation of support is on the natural parent, and that it is the exceptional case in which the obligation will be transferred to a stepparent.
I continue to be counselled by Miller's warning not to impose a child-support obligation on a stepfather merely because he developed a close relationship with the stepchildren. Without further proof, I would not alter Miller's requirement that when *584 the natural parent can be located and is financially able, he or she remains principally responsible to pay permanent child support. Id. at 169.
The concurring opinion in the present case reflects the understandable desire to spare K.B. the painful knowledge that Henry is not her biological father. As painful as that discovery may be, however, it is inevitable that one day K.B. will learn the facts. For example, Marilyn has already revealed to G.B. and M.B., K.B.'s stepbrothers, the identity of K.B.'s natural father. In addition, Marilyn advises that she intends to inform K.B. at a later date that Henry is not her natural father. As well-intentioned as the concurrence may be, it cannot spare K.B. whatever anguish she will feel when she learns the identity of her natural father.
This case stands in stark contrast to Miller, where the evidence was that the stepparent actively resisted the natural father's attempt to maintain relations with his children. Here, the whereabouts of the natural father are known; he is in the next town. Most importantly, Henry has not done anything to interfere directly with the natural father's relationship with K.B. On the present record, the absence of financial support from the natural father is as attributable to his insouciance as it is to Henry's conduct.
In seeking an appropriate judicial response, I am guided, as are the concurring justices, by the best interests of the child. Like my colleagues who join in the concurring opinion, I believe that Henry is obliged to provide support for K.B., but I would require Henry to meet that obligation only until such time as a support order may be entered against the natural father. Hence, I would remand the matter to the Chancery Division for reconsideration in light of Miller. Of course, support obligations are always subject to modification because of changed circumstances, such as the ability of the natural father to satisfy the child's support needs. Miller v. Miller, supra, 97 N.J. at 169. Because of Henry's previous agreement, included *585 in his divorce decree, to support K.B., I would place the burden upon him to show that it is in the best interest of K.B. to obtain support from the natural father. If for any reason such an order cannot be entered against the natural father, I would continue to require Henry to support K.B.
WILENTZ, C.J., and HANDLER and O'HERN, JJ., concurring in the result.
For affirmance  Chief Justice WILENTZ and Justices HANDLER and O'HERN  3.
For reversal in part; affirmance in part  Justices CLIFFORD, POLLOCK and GARIBALDI  3.
NOTES
[1] All members of the Court have agreed that Henry is obliged, at present, to continue supporting K.B. Further, we agree that Henry is liable for all overdue child support payments that should have been made on K.B.'s behalf. Thus, at this time we need not consider whether principles of res judicata should, independently, limit Henry's ability to provide appropriate necessary support for K.B. On this point, see, for example, E. v. E., 57 Wis.2d 436, 204 N.W.2d 503 (1973); see generally Zupanek, "Effect, In Subsequent Proceedings, of Paternity Findings or Implications in Divorce or Annulment Decree or in Support or Custody Order Made Incident Thereto," 78 A.L.R.3d 846 (1977) (husband and wife generally bound by paternity stipulations, although the child is not).