755 A.2d 1171 (2000)
333 N.J. Super. 362
CUMBERLAND COUNTY BOARD OF SOCIAL SERVICES, Plaintiff-Respondent,
v.
W.J.P., Defendant-Appellant, and
G.D., Defendant.
Superior Court of New Jersey, Appellate Division.
Argued February 28, 2000.
Decided July 14, 2000.
*1172 Robert J. O'Donnell, Millville, argued the cause for appellant W.J.P. (Mr. O'Donnell on the brief).
Julio L. Mendez, Vineland, argued the cause for respondent Cumberland County Board of Social Services (Mr. Mendez on the brief).
Cris D'Arrigo, Guardian ad Litem for A.P., argued the cause on her behalf (D'Arrigo & D'Arrigo, attorneys; Mr. D'Arrigo on the brief).
Before Judges HAVEY, KEEFE and A.A. RODRIGUEZ.
The opinion of the court was delivered by RODRIGUEZ, A. A., J.A.D.
In this appeal, a stepfather appeals from the Family Part's order directing that both he and the biological father of a minor each pay support for her benefit. The Family Part judge reasoned that the stepfather's obligations are premised on the fact that he acted in loco parentis. We hold that once a natural parent has been identified, has been ordered to pay support, and establishes a relationship with the minor, in loco parentis support cannot be compelled from a stepfather.
These are the pertinent facts. Anne is now age eleven.[1] Anne's mother and W.J.P. had a relationship from which one son was born. The relationship ended sometime in 1987. Anne's mother then began a relationship in December 1987 with G.D. Anne is the result of this union. Before Anne was born, her mother and G.D. ended their relationship. She then rekindled her relationship with W.J.P. When Anne was born, she received her mother's surname. Anne's mother did not identify anyone as the father on the birth certificate. Eight months later, she and W.J.P. were married. Thereafter, they had another son and two years later they separated.
*1173 During the separation, Anne's mother filed a complaint against W.J.P. for paternity of Anne. She also sought child support for all three children. W.J.P. agreed to paternity and child support, which was memorialized in a consent order. This order also directed the Bureau of Vital Statistics to issue a new birth certificate for Anne using W.J.P.'s surname. Three years later, Anne's mother and W.J.P. divorced. The final judgment of divorce provided that W.J.P. was to pay support for the two boys and Anne. Sometime in 1996, Anne's mother told her that G.D. was her natural father, not W.J.P. Since that time, W.J.P. has had virtually no contact with Anne. In August 1997, W.J.P. and Anne's mother stipulated that Anne be removed from the child support order. A consent order to this effect was entered by the court and the amount of support was reduced proportionally.
Several months later, Anne's mother applied for public assistance benefits from the Cumberland County Board of Social Services (Board). She disclosed that the natural father of her two boys was W.J.P. and the natural father of Anne was G.D. The Board filed a complaint for paternity against G.D., which he denied. The trial court ordered G.D. to undergo Human Leucocyte Antigen (H.L.A.) testing and W.J.P. was joined as a party in the paternity action. The judge directed that a Guardian ad Litem be appointed from the pro bono list in order to safeguard Anne's best interests. Thereafter, the Guardian ad Litem, Christen D'Arrigo, met with Anne and submitted a report to the trial court. The report recommended that G.D. and W.J.P. be ordered to submit to genetic paternity testing. The report also contains the following observation by the Guardian ad Litem:
Indeed, the realization that [WJP] is not her father has somewhat softened the rejection [Anne] has suffered from [him]....it was apparent to me that under no circumstances would she accept anyone other than her biological father as her "father."
The judge ordered G.D. and W.J.P. to undergo genetic paternity testing and that all parties share financial information. Thereafter, based on the genetic test results, G.D. admitted to paternity of Anne and he arranged for visitation with her.
After hearing oral argument from all parties, including the Guardian ad Litem, the judge ordered both G.D. and W.J.P. to pay child support reimbursement to the Board. The judge also ordered that the fee for the Guardian ad Litem be paid equally by G.D. and W.J.P. The judge also ordered both men to obtain a $50,000 life insurance policy for Anne's benefit, to remain in effect until Anne's emancipation. Lastly, G.D. was ordered to pay for the genetic testing. The judge issued a written opinion memorializing the oral decisions.
W.J.P. appeals the obligations to pay support and to provide life insurance coverage for Anne (December 16, 1998 order), and the obligation to pay one-half of the Guardian ad Litem fee (December 18, 1998 order). He contends that the judge erred by ordering him to pay support for Anne when her natural father has an obligation to provide support for her. W.J.P. asserts that he does not stand in loco parentis with Anne as determined by the trial court.
At common law, parents had an absolute duty to support their children. Monmouth County Div. of Soc. Serv. for D.M., n/k/a D.W. v. G.D.M., 308 N.J.Super. 83, 87-88, 705 A.2d 408 (Ch.Div.1997). There is no statutory requirement in New Jersey imposing a duty of support on third-party non-parents. Nonetheless, a person, other than a child's natural or adoptive parent, may be charged with a parent's duties and responsibilities if he or she stands in loco parentis. Miller v. Miller, 97 N.J. 154, 167, 478 A.2d 351 (1984). "The proper definition of a person in loco parentis to a child is a person who *1174 means to put himself [or herself] in the situation of the lawful father [or mother] of the child with reference to the father's [or mother's] office and duty of making provision for the child." D. v. D., 56 N.J.Super. 357, 361, 153 A.2d 332 (App.Div.1959) (citing with approval Brinkerhoff and wife v. Merselis' Executors, 24 N.J.L. 680, 683 (Sup.Ct.1855)).
Generally, an in loco parentis relationship does not permanently affix parental duties upon a step-parent. Ibid. That is, the relationship can be disclaimed after a step-parent divorces a child's natural parent. Nonetheless, courts have held that a step-parent's duty to support a spouse's child may extend beyond the dissolution of their marriage. See M.H.B. v. H.T.B., 100 N.J. 567, 498 A.2d 775 (1985); Miller, supra, 97 N.J. at 154, 478 A.2d 351; C.R. v. J.G., 306 N.J.Super. 214, 703 A.2d 385 (Ch.Div.1997). In these cases, courts have relied on principles of equitable estoppel and implied contract to impose a continuing obligation of child support upon the step-parent.
The first key case in this area is Ross v. Ross, 126 N.J.Super. 394, 314 A.2d 623 (J. & D.R. Ct.1973), aff'd, 135 N.J.Super. 35, 342 A.2d 566 (App.Div.1975). In Ross, a stepfather voluntarily allowed his name to be placed on the birth certificate of the minor child, even though he knew that the child was not his. Id. at 396, 314 A.2d 623. However, the child, in Ross, was unaware that his stepfather was not his natural father. Id. at 396-97, 314 A.2d 623. The court held that the stepfather was equitably estopped from withholding child support from the child. Id. at 400, 314 A.2d 623. Reasoning that the child would be "irretrievably injured," the court concluded that the stepfather could not repudiate "acts done or positions taken or assumed by him when there has been reliance thereon and prejudice would result to the other party." Id. at 398, 314 A.2d 623 (citations omitted). Additionally, the court in Ross found that the prior inconsistent admissions by the stepfather triggered the application of equitable estoppel. Ibid.
In Miller, the Supreme Court clarified the standard for applying principles of equitable estoppel. The Court held that a step-parent must make some representation of support to either the child or the natural parent before he or she can be obligated to continue that support. Miller, supra, 97 N.J. at 167, 478 A.2d 351. Although the Miller case specifically dealt with the issue of pendente lite support, the holding is equally applicable to permanent support obligations. Id. at 159, 478 A.2d 351. In Miller, the stepfather supported the children of his wife for seven years, as their father. Id. at 160, 478 A.2d 351. There was evidence that although the children knew he was not their father, they considered him their father and loved him very much. Ibid. Additionally, the children had used the stepfather's surname while they were in school. Id. at 161, 478 A.2d 351.
The Court, in Miller, held that in order to obligate a step-parent to continue permanent child support, there must be evidence of 1) representation; 2) reliance; and 3) detriment. Id. at 167, 478 A.2d 351. Further, the Court found that there must be some evidence "that the children will suffer future financial detriment as a result of the stepparent's representation or conduct that caused the children to be cut off from their natural parent's financial support." Id. at 168-69, 478 A.2d 351. As a result, a "natural parent should always be considered the primary recourse for child support," however, a step-parent can still be held accountable for a child's continued support. Id. at 169, 478 A.2d 351.
Next, in a factual setting similar to the case at hand, the Supreme Court determined whether a step-parent could be estopped from discontinuing a voluntarily assumed child support obligation in M.H.B. v. H.T.B., 100 N.J. 567, 498 A.2d 775 (1985). In M.H.B., the parties involved had two children together, while the third child was conceived by the natural mother *1175 and another man. Id. at 569, 498 A.2d 775. The stepfather in M.H.B., even after learning that the third child was not his own, continued to maintain a bond with all of the children after the separation and during a short-lived attempt at reconciliation. Ibid. The couple signed a separation agreement followed by a final decree of divorce whereby all three children were considered born of the marriage and all three children were to receive child support from the stepfather. Id. at 570, 498 A.2d 775.
Relying on the principles set forth in Miller, the Court held that the stepfather was equitably estopped from denying his duty to provide child support for the child that was not naturally his. Id. at 578-79, 498 A.2d 775. The Court concluded that the stepfather's actions amounted to "a voluntary and knowing course of conduct with respect to [the child], which constituted in its purpose and effect an affirmative representation that he was her natural father." Id. at 576, 498 A.2d 775. The Court continued finding that the child's reliance was detrimental due to the financial harm she would suffer if her stepfather were allowed to "evade the responsibilities he had assumed." Id. at 577, 498 A.2d 775.
In the most recent case in this area, Camden County Board of Social Services v. Yocavitch, 251 N.J.Super. 24, 34, 596 A.2d 769 (Ch.Div.1991), the Chancery Division determined that a natural father can not use principles of equitable estoppel to deny a duty to pay child support based on a stepfather's representations. In Yocavitch, the stepfather consented to support for a non-biological child during and after the divorce. Id. at 28, 596 A.2d 769. When the Board of Social Services brought a paternity suit against the natural father, the natural father brought in the stepfather as a third-party defendant. Ibid. The trial court held that the natural father could not use equitable estoppel to deny his obligation because he could not demonstrate the three requirements of representation, reliance and detriment. Id. at 31, 596 A.2d 769. The trial court stated further that a stepfather's "inaction" (acceptance of a child as his own knowing that the child was not his) "is not that type of `positive action interfering with the natural parent's support obligation' which Miller requires before the step-parent is bound." Id. at 31-32, 596 A.2d 769. Hence, Yocavitch does not allow a natural father to use "equitable estoppel as a shield to avoid his own obligation." Id. at 32, 596 A.2d 769.
The present case is different from Ross, Miller, M.H.B., and Yocavitch. Here, there is a biological father who is paying support and has established a bond with the child. Moreover, the stepfather, W.J.P., has terminated his relationship with Anne. As the Guardian ad Litem's report states, Anne has accepted G.D. as her father and does not want a relationship with W.J.P. Under these circumstances, it would be inequitable to foist a continuing in loco parentis status on W.J.P. with a concomitant support obligation. Therefore, we conclude that W.J.P. has no support obligation towards Anne after August 26, 1998, the date G.D. admitted paternity and began to take steps to establish a parental relationship with her. Based on this conclusion, we decline to consider W.J.P.'s argument that: (1) the judge's order requiring him to pay $37.00 per week for child support to Anne failed to consider the Child Support Guidelines pursuant to R. 5:6A; (2) there is no need for additional support from W.J.P. because Anne's financial needs are being met by G.D.; (3) the judge erred by failing to consider a prior order which was not appealed or subject to a motion under R. 4:50-1; and (4) the judge erred by determining W.J.P.'s child support obligation when not considering his financial circumstances and failing to place appropriate factual basis upon the record to support such an order.
The remaining contentions raised by W.J.P. are: the judge's decision to order defendant to pay part of the Guardian ad *1176 Litem fee was inappropriate when considering defendant's financial circumstances; and the judge's findings do not comport with the pleadings and documents submitted. After careful review of the record we are satisfied that these legal issues are clearly without merit and an opinion would have no precedential value. R. 2:11-3(e)(1)(E).
Accordingly, those portions of the December 16, 1998 order which imposed a child support obligation on W.J.P. after August 26, 1998, and the obligation to obtain a life insurance policy for the benefit of Anne are reversed. In all other aspects, the December 16, 1998 order is affirmed. Additionally, the December 18, 1998 order directing W.J.P. to pay one-half of the Guardian ad Litem fee, is affirmed.
NOTES
[1] Anne is a fictitious name. She is identified in the record as A.P.